## UNITED STATES ET AL. *v.* PIERCE AUTO FREIGHT LINES, INC. ET AL.

No. 74. Argued January 28, 1946.—Decided March 11, 1946.

*J. Stanley Payne* argued the cause for the United States and the Interstate Commerce Commission, appellants. With him on the brief were *Solicitor General McGrath, Walter J. Cummings, Jr., Daniel W. Knowlton* and *Allen Crenshaw.*

*Donald A. Schafer* argued the cause and filed a brief for Consolidated Freightways, Inc. et al., appellants.

*Wm. P. Ellis* argued the cause for appellees. With him on the brief were *Henry T. Ivers* and *Alfred A. Hampson.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The validity of an order of the Interstate Commerce Commission is in question. The order granted to appellants, Consolidated Freightways, Inc., and Oregon-Nevada-California Fast Freight, Inc., certificates of public convenience and necessity authorizing extensions of their operations as motor carriers. Appellees, competing carriers, some of whom are railway affiliates, were protestants in the proceedings before the Commission. They successfully attacked the order in a specially constituted District Court, on grounds questioning the sufficiency of the findings and the evidence, as well as the propriety and fairness of the Commission's procedure. The District Court's decree, 57 F. Supp. 192, "suspended" the order and remanded the cause to the Commission for rehearing although a stay pending appeal was denied.

The shortened statement of the major thing in controversy is whether the appellants, Consolidated and O. N. C., properly were allowed by the Commission to substitute wholly independent and competing through services between Portland, Oregon, and San Francisco, California, for the service which they jointly rendered between those cities, prior to the filing of these applications, by interchanging freight at intermediate points. The protesting appellees were carriers competing with the joint service of Consolidated and O. N. C. and will be competitors of each, as those companies will be with each other, if the Commission's order is sustained. This fact is the source of the controversy and is important to bear in mind for full understanding of the detailed facts and issues as well as of what is ultimately at stake. Although each ap-

pellant originally sought exclusive authority to conduct the proposed through operation in substitution for the former joint service, and thus opposed the other's application, both now seek to sustain the Commission's order, as of course does the Commission itself.

At the time of Consolidated's application in December, 1939, it operated various routes in the Northwest, some extending eastward from the Portland and Seattle areas, in addition to the joint service by interchange with O. N. C. southward from Portland to San Francisco.[1] Two of these routes, comprising part of the latter service, extended from Portland southerly to Medford and Klamath Falls, both of which lie just north of the Oregon-California boundary and were points of interchange with O. N. C.[2] In so far as it is now pertinent, Consolidated's application sought permission to extend its operations from Medford and Klamath Falls southward to San Francisco,[3] in other words, over the portion of the route previously used in the joint service for O. N. C.'s operations.

---

[1] There are two main north-south highways between the San Francisco and Portland areas, U. S. 101, the so-called Coast Route, and U. S. 99, roughly parallel but some miles inland, called the Valley Route. The joint service was conducted over the latter and the applications of Consolidated and O. N. C. each sought to extend operations over this route.

[2] The joint service followed Highway 99 from San Francisco nearly to the northern boundary of California, from where part continued on No. 99 to Medford and the remainder followed a separate highway to Klamath Falls, this leg of the journey being made with O. N. C.'s equipment in both directions. Consolidated's "leg" between Portland at the north and Medford and Klamath Falls at the south followed different, but substantially parallel, highways, the westerly route being No. 99.

[3] Consolidated also sought authority to extend its service from Marshfield, Oregon, to San Francisco over the Coast Route, see note 1, and from Lakeview, Oregon, to Redding, California, through Alturas, California.

Conversely, at the time of O. N. C.'s application in January, 1940, it was operating from San Francisco to Medford and Klamath Falls.[4]  It sought to extend its operations from Medford to Portland and, as an alternative slightly longer route, from Klamath Falls to Portland through Goshen, Oregon.[5]

Thus, in effect, Consolidated and O. N. C. each sought to conduct operations independently throughout the entire distance between Portland and San Francisco.[6]  The occasion for the separate applications was O. N. C.'s refusal to join an association of connecting carriers which Consolidated was sponsoring.[7]

The applications were heard separately, as the statute requires, before different joint boards.[8]  However, because

---

[4] O. N. C. also operated a route from San Francisco to Elko, Nevada.

[5] O. N. C. also sought authority to serve Marshfield, Oregon, and other points in the Coos Bay area.

[6] The Commission stated in its report: ". . . O. N. C. and Consolidated have interchanged freight at Medford for over 11 years and at Klamath Falls for over 6 years to give joint through service between points served by each.  Since July 1939 about one-third of the tonnage has been handled through interchange of trailers.  At first, the amount of interchanged traffic was small and Consolidated's principal business was of a local nature to and from Medford.  Apparently, O. N. C.'s principal business also was local.  The interchange business has since increased until it far exceeds that of the local business."

[7] Although the president of Consolidated admitted at the hearing that O. N. C.'s refusal to join the association had a substantial influence in causing the filing of Consolidated's application, he could not say whether or not that application would have been filed if O. N. C. had joined.

[8] Section 205 (a) of the Interstate Commerce Act, 49 U. S. C. § 305 (a).  Apparently the reason that the two proceedings were not consolidated and heard before one joint board arose from the fact that, although the major issue, whether or not a through route between San Francisco and Portland should be allowed, was common to both

they were so closely related in their common features, the hearings were held at the same places and one application was heard immediately after the other. Each applicant intervened in the proceeding on the other's application, and various parties, including the appellees,[9] appeared in opposition in both proceedings. The parties stipulated that much of the evidence presented in the O. N. C. hearing should be introduced by reference into the Consolidated record. This included all of the appellees' affirmative evidence in opposition to the two applications. The hearings thus were substantially coordinated, though not technically consolidated, for the common features of the applications.

As neither joint board could agree upon the recommendations to be made, both matters were referred to an examiner.[10] In separate reports he recommended the denial of both applications. Division 5, with one commissioner dissenting, dealt with both in a single report. It reversed the examiner in both cases and ordered that each

cases, certain other issues were not and, since some of the latter relating to O. N. C. affected operations in Washington as well as in Oregon and California, a differently constituted board was required for making recommendations concerning them. Cf. *American Trucking Ass'ns* v. *United States,* 326 U. S. 77, 81–83.

[9] There are five appellees. Pierce Auto Freight Lines, Inc., Los Angeles-Seattle Motor Express, and Angelo Colletti (doing business as Colletti Fast Freight), are common carriers by motor vehicle which operate between Portland and San Francisco. Pacific Motor Trucking Company is a subsidiary of Southern Pacific Company and performs certain motor vehicle operations which are auxiliary to the rail services of the Southern Pacific Railway. Pacific Southwest Railroad Association is an unincorporated association of railroads serving the Pacific southwest territory, organized to protect rail interests as they may be affected by motor carrier operations in that territory.

[10] Section 205 (b) of the Interstate Commerce Act, 49 U. S. C. § 305 (b).

application be granted.[11]  Appellees' petition for rehearing was denied. · They thereupon brought this suit in the District Court.[12]

The findings of fact and the court's opinion, 57 F. Supp. 192, disclose that it held the Commission's order invalid on several grounds.  One was that "the Commission considered the separate records as though the case was a consolidated one.  Evidence which appeared only in one record was used by the Commission to support general findings in the Report concerning both Consolidated and O. N. C.  In each proceeding embraced within the Report and the Commission's order, evidence not offered or received in such proceeding and not a part of the record therein was drawn upon and considered by the Commission."  The court also found that there was no evidence in either record to support the Commission's finding that "the present and future public convenience and necessity require *both* the operations" by Consolidated and those by O. N. C. · (Emphasis added.)  And it further found that at no time in the proceeding had there been notice to the parties, the witnesses, or the general public that *both*

---

[11] The certificate of public convenience and necessity granted to Consolidated authorizes extensions of its routes from Medford and Klamath Falls to San Francisco and also from Lakeview, Oregon, to Redding, California.  The certificate granted to O. N. C. authorizes extensions from Medford to Portland and from Klamath Falls to Goshen, Oregon.  In both cases, operation was thus authorized over alternate highways.  Cf. notes 3 and 5.

[12] The District Court permitted Consolidated to intervene and file an answer "with admissions and denials to the petition," but refused to consider and ordered stricken the affirmative defenses which Consolidated set up.  One of these was that the appellees were guilty of laches in bringing the suit, since the certificates of public convenience and necessity were issued in September, 1943, and the complaint was not filed until January, 1944.  Consolidated contends that the District Court erred in striking the affirmative defenses.  In the view that we take of the case it is not necessary to consider this question.

applications might be granted; that indeed "the whole basis of the original proceedings before the Joint Boards was the question of whether *any* through-line operation between San Francisco and Portland should be allowed and, if so, *which one* of the two separate applications"; and that "no opportunity was given to plaintiffs to maintain their rights or to present appropriate protests and defenses to the institution of *two competing* through-line operations between San Francisco and Portland." (Emphasis added.) Finally the court held that in granting both applications the Commission had not considered the public interest and suggested that its denial of the petition for rehearing was improper.[18]

For all these supposed errors the District Court suspended the Commission's order and remanded the cause "for rehearing." In doing so it said: "This action will be taken in order that all parties may be placed on notice as to what type hearing will be held, whether joint or several, and in order that appropriate findings be made as to the public convenience and necessity which requires the authorization of *two* new through-lines in competition with each other and in competition with the other facilities, and also as to the ability of Consolidated to initiate and maintain one of such lines *in view of present conditions.*" (Emphasis added.) 57 F. Supp. at 198.

[18] The District Court also found that "The Commission failed to find, and there was no evidence in either record to support such a finding, that each applicant was separately capable of equipping, maintaining, and conducting the proposed operation in the face of competition from the other"; that "the Commission's Report fails to disclose that it gave any consideration to the possibility of adverse effect upon any plaintiff of the institution of two through-line competitive operations between San Francisco and Portland"; and that "the Commission failed to find, and there is no evidence in either record to support such a finding, that Consolidated is adequately equipped to establish and maintain the proposed through-line operations under any conditions." These findings are considered below.

Obviously the court's objection was not to the manner in which the proceedings were conducted prior to the time when the hearings ended and the Commission took the cases under consideration. Up to this point no fault is found with what was done. The difficulty lay altogether, in the court's view, with the way in which it thought the Commission had considered the cases and reached its conclusions. And this arose entirely from the fact that the Commission disposed of them in a single report, rather than in separate ones for each case; and from the further fact that it concluded that both applications should be granted rather than that both should be denied or one denied and one granted.

We are not informed, of course, whether the court would have reached the same result if the Commission had written separate reports in each case, arriving at the same conclusions, although it seems suggested that any of the other possible results would have been impeccable, whether stated in separate reports or a single one. Obviously it was no sufficient ground for suspending the Commission's order that it chose to write one report rather than two, especially in matters as closely related as these, if the single report together with the findings and the evidence was sufficient to sustain the action taken in each case. It is not uncommon judicial practice to follow this course.

Nor, with those conditions satisfied, could the mere fact that the Commission concluded to grant rather than to deny both applications, or to grant one and deny the other, invalidate its judgment. For each application when it was filed sought to conduct the extended operation which it specified; [14] nothing in either foreclosed the

---

[14] They were not the same, since *the extension* sought in each case covered the portion of the joint route over which the other applicant then was operating. But, of course, if one application had been

possibility that both might be granted, although for obvious reasons each applicant opposed the granting of the other's extension; and from the beginning it was as much a possible outcome that both applications would be granted as that both would be denied or one be granted and one denied. If therefore the Commission had written separate reports in each case, reaching the same result, it /would have been squarely within the issues and within the outcomes comprehended from the beginning; and the only questions for judicial consideration, absent some procedural deviation not now presented, would have been the sufficiency of the findings and the evidence to sustain its action in each case. We think those are the only questions of any substance arising upon this appeal.

The District Court, however, regarded the Commission's failure to write separate reports as indicating that it did not consider each case separately and exclusively on its own record, but looked to the evidence in both in forming its judgment. This "approach" the court thought wrong, not only as showing that the Commission considered evidence in each case which it had no right to take into account, but also as injecting a new and important issue in both proceedings not previously regarded by the parties as .comprehended within the applications and the hearings. The "new issue" thought to be thus injected was the possibility that *both* applications might be granted. From this

granted and one denied, the practical effect would have been to award to the successful applicant the entire route of the prior joint service, and thus to exclude the unsuccessful one at least from any share in the joint operation; probably also from any practical opportunity of successful operation over its remaining "leg" of the previous joint service. These considerations no doubt were influential in leading the Commission to conclude that either both applications should be granted or both denied, since to grant one and deny the other, entirely apart from considerations relating to so-called "grandfather rights," would work obvious hardship on one. Cf. note 15.

basic idea other errors were pyramided, among them that the protesting appellees had been given no notice of the kind of proceeding which would be held and had been deprived of any opportunity to present proper protests and evidence relating to the allegedly newly injected issue.

The case has taken longer to state than the merits should require for its disposition. Appellees plant themselves here squarely on the District Court's objections to the Commission's "approach" and procedure. Two principal questions thus are presented: (1) Was evidence improperly considered by the Commission, so as to require reversal of its order; and (2) were new issues injected by its action in disposing of the cases with a single report? Other issues more or less related may be shortly disposed of.

We put to one side, in the first place, the idea that the Commission, by the manner in which it disposed of the causes, injected as a "new issue" the question whether both applications might be granted and with it the correlative notions that the appellees had no notice that this issue would be involved and no opportunity to make appropriate protests or to present evidence upon it. In a strict view neither the appellees nor the court were entitled to raise these questions. For it was not at any time suggested to the Commission, as it might have been upon petition for rehearing, that the proceedings had been conducted on the theory that both applications would not be granted. Appellees stated in their petition for rehearing only that "Division 5 has erroneously and improperly assumed that in granting one of the applications it is by force of necessity required to grant the other . . . ." This is very different from suggesting that the Commission was not entitled at all to consider granting both applications. It is highly questionable therefore whether the appellees have not waived this question. But the District Court,

in raising it, has said that it was acting in protection of the public interest and we pass therefore to consideration of the issue on its merits.

The Commission did not, by the manner in which it disposed of the cause, inject as a "new issue" the question whether both applications might be granted. If the appellees actually assumed in the beginning that both applications could not be granted, their assumption was in the teeth of the applications and the permissible outcomes presented for the Commission's decision.

As has been said, the two applications were separately instituted and heard. In the natural course of events each joint board was to decide whether to grant or to deny the particular application before it. The possibilities therefore were that both applications might be denied, that one might be granted and the other denied, or that both might be granted. Moreover, the record contains evidence showing that the possibility of granting both applications was in the minds of counsel and witnesses.[15]

---

[15] One example is sufficient. The president of Consolidated was asked:

"From your experience in watching the development of this joint service, what do you expect the effect to be of the granting of this application upon the existing carriers between San Francisco and Medford, and San Francisco and Klamath Falls?" He replied:

"Treating them separately, south of Medford, we have in our operation the Oregon-Nevada-California Fast Freight and the Pacific Truck Express and the Pierce Auto Lines.

"The California Fast Freight are concurrently applying for the right to extend their services north of Medford to Portland. The net result of the granting of their application and our application would be the splitting of the traffic between the two companies. We would each take part of the present business we are now jointly handling, and operate our equipment straight through.

"In my opinion, this will result in both of us operating about the same number of vehicles, about the same number of miles; and if our divisions of revenues of the past have been properly arranged,

And this possibility must have been apparent from the beginning, not only from the history of the prior operations and the primary cause for their impending disruption, but also from the obvious relations of the applications to each other, the equally obvious consequences to the applicants of granting one and denying the other, and the Commission's recognition of these facts by the manner in which it scheduled the hearings for substantially concurrent treatment. The parties too apparently gave similar recognition to the questioned possible outcome by their stipulation for the use of evidence in both proceedings.

The issue concerning whether both applications should be granted was injected, not by the Commission's report or any other action taken by it, but by the filing of the applications in the first place. If appellees misconceived the nature of the proceedings in this respect, as we do not think was the case, they were not misled into doing so by any action of the Commission or the other appellants.

We turn therefore to the objections made on the score of the Commission's findings and its treatment of the evidence. In our opinion they are equally untenable. The

we continue to gross about the same amount of revenue. It should result in our both having a more profitable operation, as it will eliminate the present waste of checking, weighing, and transferring freight at an intermediate point.

"The service would be improved and no doubt it would attract more volume. That is a conjecture. At the present time, both companies are maintaining terminal facilities in San Francisco so on our part it would mean very little increase in our terminal costs.

"It will mean an increase in terminal costs for the Oregon-Nevada-California Fast Freight, but the cost of it would be offset, in my opinion, by eliminating the cost of transferring the through freight at Medford."

In its report, the Commission stated, *"For reasons which are obvious* [see note 14], authority should be either granted or denied to both applicants to operate over the Valley Route." (Emphasis added.)

principal cause of complaint in these respects is that the Commission did not consider each case exclusively on its own record but looked to the evidence in both proceedings in forming its judgment. If this is true and if it has resulted in substantial prejudice to the appellees, as might occur, for example, if the Commission were shown prejudicially to have considered evidence bearing on one case which did not affect it and was presented in the other, and which appellees were given no opportunity to meet, the orders, or one of them, would be improperly grounded.

But no showing of this sort has been made. It is to be recalled that all of the appellees, as well as both of the applicants, were parties to both proceedings; were represented at all of the hearings, which were conducted at substantially the same times and places; and were given full opportunity to present all evidence they considered pertinent, to cross-examine witnesses and otherwise to protect their interests. Moreover, large portions of the evidence applied as much to one application as to another. This was true, for example, of the proofs relating to traffic conditions, shipper demands, the need for faster service and mechanical refrigeration, and other items. In these circumstances it is difficult to see how appellees could have sustained substantial prejudice from the Commission's consideration of the evidence upon matters as closely related as those in issue in these two proceedings.

Nor indeed do they succeed in showing such prejudice. As we understand them, the most that they assert is that the Commission's report so commingles the two cases that it is impossible to determine which statements are supported by which record. But neither in the briefs, nor upon specific inquiry at the argument, were they able to point to any particular instance of prejudice. Nor in fact does the opinion of the District Court, although it asserts that the report is filled with numerous instances of this

sort. The assertion, we think, is colored by the court's erroneous idea that the report first injected the question whether both applications should be granted; and to the same cause, it would seem, may be attributed the court's undue discounting of the fact that upon this issue, as on. the alternative possible outcomes, much of the evidence was identical, made so by the parties' own stipulation. In any event the appellees have not pointed to any specific statement in the report which is obviously applicable to both cases or which is required as a basic finding to support the order in one, which is without support in both records or in the one which is appropriate.

In the absence of any showing of specific prejudice, the claim comes down to the highly technical objection that the Commission, in the final stage of forming its judgment, could not in either case take account of what had been done in the other, notwithstanding the closely related character and objects of the applications and the prior proceedings. The contention in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left hand may be doing.

Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders. Whatever may be the limits outside which it cannot go in looking beyond the record in the particular proceeding at the stage of formulating its judgment, none certainly would go so far. And, given that the report contains all the essential findings required, cf. *Florida* v. *United States*, 282 U. S. 194, the Commission is not compelled to annotate to each finding the evidence supporting it.

It is true that ordinarily an administrative agency will act appropriately, in a proceeding of this sort, upon the

record presented and such matters as properly may receive its attention through "official notice." [16]   It is also true that this Court, in appropriate instances, has limited the use of the latter implement in order to assure that the parties will not be deprived of a fair hearing.   See *United States* v. *Abilene & Southern R. Co.*, 265 U. S. 274, 286–290; *Interstate Commerce Commission* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 93–94.   But in doing so it has not undertaken to make a fetish of sticking squarely within the four corners of the specific record in administrative proceedings or of pinning down such agencies, with reference to fact determinations, even more rigidly than the courts in strictly judicial proceedings.   On the contrary, in the one case as in the other, the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result.   *Market Street R. Co.* v. *Railroad Comm'n*, 324 U. S. 548, 561–562; cf. *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126, 154–155.   In these cases no more is necessary than to apply that rule.

The remaining objections are directed more appropriately to the findings and their support in the evidence. Appellees say that the order granting both applications is defective in that it is not founded upon an express finding or indeed upon any finding that there was a need for two through-line operations which would be in competition with one another.   They urge that it was not sufficient for the Commission to find, as it did on adequate evidence, that the existing service between Portland and San Francisco was inadequate; and to conclude, as the report expressly stated, that in view of this fact, among others, "public convenience and necessity require the op-

---

[16] Cf. Judicial Notice by Administrative Tribunals (1934) 44 Yale L. J. 355; Faris, Judicial Notice by Administrative Bodies (1928) 4 Ind. L. J. 167.

erations set forth in our findings herein." [17]   This state-
ment was additional to the explicit conclusion already
noted [18] that the situation presented by the applications
was one which required either granting both or denying
both. And the findings expressly stated, concerning each
application, that the "present and future public conven-
ience and necessity require" the extended operations.[19]

Apart from the fact that this was all that the statute
required, cf. *United States* v. *Detroit & Cleveland Navi-*

---

[17] The Commission's report stated: "Of the motor-carrier protes-
tants, there is only one—Pierce—which is authorized to transport gen-
eral commodities to and from all intermediate points along the Valley
Route.  Pierce did not reinstitute daily operation to and from San
Francisco, however, until after the filing of these applications and but
a few weeks prior to the hearings herein.  Shipper witnesses generally
were unfamiliar with the fact that Pierce's operation was daily.  There
are, of course, certain other motor carriers operating over this route
but their authority is either (1) restricted in such a way as to preclude
a finding that their service is adequate especially as to intermediate
points, or (2) the record definitely establishes that their service to
intermediate points, and in some instances to and from San Francisco,
is at best negligible.  In view of the foregoing, we are of the opinion
that public convenience and necessity require the operations set forth
in our findings herein."

[18] See note 14.

[19] The Commission rested this ultimate finding in part upon the
following statement as to the need for extended operations: "There
is no doubt but that a number of shippers desire such proposed serv-
ices.  Each applicant also operates units equipped with mechanical
refrigeration, which service certain of the shippers desire for the
proper transportation of their shipments.  The proposed service will
enable shippers to obtain goods more rapidly, resulting in an increase
in their businesses.  Some of the shippers estimate an increase in
business amounting to several thousand dollars.  Practically all of the
witnesses prefer a single-line through service.  Some of them have
used the services of existing carriers and have not found them satis-
factory principally because of improper refrigeration or lack of service
to intermediate points."  See also note 17.  The Commission noted
in its report that the traffic between San Francisco and Portland was
increasing.

*gation Co.,* 326 U. S. 236, and the further fact that there can be no presumption that the Commission disregarded the public or any other interest, there are two obvious answers. One is that the Commission, in making the separately stated findings, could not have been oblivious to the competitive consequences of its order or the relation of those consequences to the public interest.[20] The other is that those findings, read in the light of the report, adequately and expressly cover the element of public convenience and necessity, including the competitive factors which the Commission inescapably had in mind. Only the most hypercritical reading of the findings, and one which ignores the report's explicit statements in many respects, could construe them as meaning only that *each* operation was required by public convenience and necessity without any regard to the competitive consequences of granting *both.* The Commission should not be required to rewrite its report simply to say, redundantly we think, that *both* operations, as well as each, are required by public convenience and necessity.

Appellees further say that, even if the Commission was correct in granting a certificate of public convenience and necessity to O. N. C., it improperly granted such a certificate to Consolidated. Section 207 (a) requires that the Commission find "that the applicant is fit, willing, and able properly to perform the service proposed" and the District Court made a finding of fact that "the Commission failed to find, and there is no evidence in either record to support such a finding, that Consolidated is adequately equipped . . . under any conditions."

---

[20] The Commission has recognized the value of reasonable competition, cf. *Chesapeake & Ohio R. Co.* v. *United States,* 283 U. S. 35; *United States* v. *Detroit & Cleveland Navigation Co.,* 326 U. S. 236; *Inland Motor Freight* v. *United States,* 36 F. Supp. 885; 44 M. C. C. 535, 548, in no case perhaps more clearly than in those presented on this appeal. See also note 15.

The court undoubtedly did not mean that there was no finding whatever as to fitness, willingness and ability, for the Commission did make such a finding in the statutory language. What was obviously meant was that such an ultimate finding was not enough, as of course it was not, see *Florida* v. *United States, supra,* in the absence of a basic finding to support it; and that there was no such basic finding.

We do not agree, however, that there was no such basic finding. The paragraph of the Commission's report set out in the margin [21] was a sufficient finding, though inartistically drawn, concerning Consolidated's financial fitness and ability. Nor was there a lack of evidence to support this.[22]

---

[21] "Fitness.—There is no doubt as to O. N. C.'s fitness, financial or otherwise, to conduct the operations herein authorized, although protestants question Consolidated's financial ability to conduct the proposed operation. Protestants contend that if these applications are granted each applicant will operate at a loss. Each applicant of course claims that it will be better off if allowed to operate straight through without the necessity of interchanging at Medford. Elimination of the cost of transfer at Medford would save approximately fifteen or sixteen hundred dollars a month. Considering the fact heretofore discussed in some detail, we are of the opinion that we should give applicants the benefit of any doubts that may exist as to whether they could operate successfully over the routes authorized herein." See also note 22.

[22] It is true that in 1939 Consolidated had approximately $215,000 of current liabilities in excess of current assets and had hypothecated a great deal of equipment as a means of obtaining capital. Nevertheless, from its inception the company had been financed largely out of earnings and in every year but 1932 had been able to earn profits. Moreover, there was ample testimony that its service was satisfactory and reliable. There was evidence also from which the Commission could find that the additional financial burden which would be imposed by granting Consolidated's application could be met by that company. The amount of additional capital investment needed for terminals and equipment was doubtful. But there was testimony that

Finally, the District Court remanded the cases for re-hearing in order for the Commission, among other things, to determine Consolidated's fitness "to initiate and main-tain one of such lines in view of present conditions." This action was unwarranted. The records in the two proceed-ings were closed in October, 1940. The Commission issued its report and order on March 1, 1943. A petition for re-hearing was filed by the appellees and other protestants on April 30, 1943, and was denied by the Commission on August 2, 1943.[23] The certificates were issued on Septem-ber 7 and 15, 1943. Suit was brought in the District Court on January 13, 1944. The court rendered its decision on September 20, 1944, suggesting that the Commission had improperly denied the petition for rehearing. Its view was that the record was so stale, particularly in view of the influence of the war upon transportation facilities, that application of the doctrine of *Atchison, T. & S. F. R. Co. v. United States,* 284 U. S. 248, was proper.

That case, as has been indicated more than once, was "promptly restricted . . . to its special facts, *United States v. Northern Pacific Ry. Co.,* 288 U. S. 490, and it

the intermediate cash outlay necessary for new terminals at Oakland and Sacramento would not be more than $12,000 and that, if additional equipment were needed, Consolidated was in a position to furnish it and have it financed. In addition, because of the considerable dis-tance covered by the new through route, Consolidated would be able to make "a profitable load factor."

On this and other evidence we cannot say that the Commission's finding as to the financial ability of Consolidated to undertake the new service lacked support in the record. For us or the District Court to do so would be to invade the Commission's proper function.

[23] In its exceptions to the examiner's report, O. N. C. asked that the proceeding be reopened because of many changes that had oc-curred since the closing of the record. In its report, the Commission stated: "In its exceptions, O. N. C. also requests a further hearing, but in view of our conclusions herein it is doubtful whether it would still desire such further hearing. Its request for further hearing is hereby denied."

stands virtually alone." *Interstate Commerce Commission* v. *Jersey City*, 322 U. S. 503, 515; see also *Baltimore & Ohio R. Co.* v. *United States*, 298 U. S. 349, 389. Except in the single instance, it has been held consistently that rehearings before administrative bodies are addressed to their own discretion. *Interstate Commerce Commission* v. *Jersey City, supra.* Only a showing of the clearest abuse of discretion could sustain an exception to that rule. The Commission was well acquainted with the impact of the war upon facilities for transport and upon the transportation business in general. In addition to its own expert knowledge concerning such matters, it had before it not only the facts set forth in the petition for rehearing [24] but also those alleged in the extended replies filed by the applicants.

We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that ". . . the courts must in a litigated case, be the arbiters of the paramount public interest." [25] This is rather the

[24] The petition alleged, in part, that "new motor vehicle common carrier operations such as are authorized by the order and which duplicate adequate existing operations are forbidden by orders of the Office of Defense Transportation"; that "since orders of the Office of Defense Transportation prohibit speeds in excess of 35 miles per hour, and the promised service would require consistent highway speeds averaging 52½ miles per hour outside of cities and other restricted areas, it is certain the service proposed and authorized cannot and will not be given, nor can any service faster than that of existing operators be rendered"; and that "all controlling statements of fact relied upon by the division to sustain its conclusions were as of the date of the report and are now entirely and completely untrue . . ."

[25] The full sentence is as follows: "While it is true that problems such as these can only be brought to the courts when private interests conceive there has been injury of rights of property, and although the field of judicial review of administrative determination has been narrowly confined, the courts must in a litigated case, be the arbiters of the paramount public interest." 57 F. Supp. 192, 196.

business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law.

The judgment is

*Reversed.*

MR. JUSTICE DOUGLAS dissents.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.