IN THE MATTER OF SHORE HILLS WATER COMPANY, APPLICATION NO. 1366 TO DIVERT WATER FROM A WELL IN THE TOWNSHIP OF ROXBURY, MORRIS COUNTY.

SHORE HILLS WATER COMPANY, A CORPORATION OF NEW JERSEY, APPELLANT, v. WATER POLICY AND SUPPLY COUNCIL, DIVISION OF WATER POLICY AND SUPPLY, DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 19, 1968—Decided June 4, 1968.

216

Before Judges GOLDMANN, LEWIS and CARTON.

*Mr. John R. Sailer* argued the cause for appellant (*Mr. Russell Fleming, Jr.,* on the brief).

*Mr. Joseph M. Jacobs* argued the cause for respondent township (*Messrs. Harrison & Jacobs,* attorneys; *Mr. Joseph Harrison,* of counsel; *Mr. Donald S. Coburn,* on the brief).

*Mr. Arthur J. Sills,* Attorney General of New Jersey, filed a statement in lieu of brief on behalf of respondent Water Policy and Supply Council; *Mr. Alan B. Rothstein,* Deputy Attorney General, of counsel.

The opinion of the court was delivered by

GOLDMANN, S. J. A. D.   Shore Hills Water Company (Shore Hills) appeals from a decision of the Water Policy and Supply Council, in the Division of Water Policy and Supply, Department of Conservation and Economic Development, denying its application for approval of plans to divert a maximum average of 720,000 gallons of water daily during any month from a new rock well to be located on the west

side of Center Street, Roxbury Township, beyond the company's franchised area and some 3,000' from the terminal point of its main.

I

Shore Hills is a relatively small private water supplier. About 95% of its franchised area (approximately the same percentage as its 940 customers) is located in the northern section of Roxbury Township. The remainder lies in the adjoining Borough of Mount Arlington. Roxbury Township has its own water system; additionally, there are seven other private water suppliers, including Shore Hills, serving scattered areas of the township.

Shore Hills' present source of supply is two wells, one with a nominal rating of 50 gallons a minute (about 58,000 gallons a day) and the other with a nominal rating of 250 gallons a minute (about 288,000 gallons a day) — a total just short of 350,000 gallons a day. The company also maintains two storage tanks with a total capacity of 315,-000 gallons, designed to provide peak hour flows for general service and fire service. These wells and tanks are all located within the company's franchised area.

Roxbury Township's concern for the orderly and economical development of an overall water and sewer master plan for the entire municipality began to take definite form in 1960. The governing body made a policy determination that real estate developers would have to install sewers instead of septic tanks; and, further, the township would conduct negotiations with a view to acquiring the private water companies, so that Roxbury would have its own integrated municipal water system. The township engaged consulting engineers to prepare a master water plan, and test wells were drilled in the northern part of the township which revealed the presence of a good well field.

As a next step in developing a coordinated water supply distribution system, the township applied to the Water Policy and Supply Council in 1961 for diversion rights from a well

to be located south of Center Street in the previously discovered well field. The application was granted following a public hearing.

Shore Hills' present application is substantially the same as one made and denied in 1965 when the company sought permission to locate an additional well on a site west of Center Street (the same site as is here involved) located 3,500' outside the company's franchised area and within 1,700' of the township's present well. Roxbury Township voiced its objection at the hearing on that application. On May 11, 1965 the Council denied the application but allowed the company to increase its diversion rights from an average of 200,000 to an average of 325,000 gallons daily during any one month. There was no appeal from that determination.

Roxbury Township thereafter requested an extension of time on the diversion rights granted under its 1961 application. Shore Hills appeared and participated as an objector at the August 1966 hearing on the request. The Council granted the extension. In the meantime, Shore Hills had on July 5, 1966 filed the application here involved, to divert 720,000 gallons daily during any month from the proposed new rock well.

Roxbury Township filed a formal objection in advance of the hearing on that application. Among the reasons set out were that (1) the requested diversion would be from a well situated substantially outside the company's franchised area, and the township had not consented to Shore Hills extending its lines into the area from which the proposed water supply was to be drawn, nor did the governing body intend to grant such consent; (2) the Council had in 1961 granted the township the right to withdraw 500,000 gallons of water daily from its well (now in operation) situated in close proximity to the company's proposed well, and the township had installed water mains throughout the area; (3) the company's present application was identical to the one denied by the Council in May 1965, and there had been no material change in circumstances in the interim; (4) the company

had sufficient water sources from which it could adequately supply customers within its franchised area — in fact, the Council had in May 1965 granted it permission to divert additional water not exceeding an average of 325,000 gallons daily during any one month from its existing wells; (5) the productive capacity of the township's well would be adversely affected by the company's proposed water diversion, and (6) the township's progress toward a municipally-owned system contemplated a water and sewer system servicing the entire community, and the company's proposed water diversion would interfere with the township's plans. The township also gave notice that it entered such further objections as were developed at the 1965 hearing on the company's prior application.

At the January 9, 1967 hearing on the application here in question Shore Hills presented two witnesses: its vice-president and its engineer, Borghard, who testified as an expert that the requested well was necessary to meet anticipated needs. Essentially, the company attempted to support its case by updating the exhibits it had presented at the 1965 hearing involving a similar application. In denying the latter the Council had directed the company to file a report "regarding further explorations for additional water supply within the presently franchised area, within one year from the date hereof." The company had made no attempt to comply with that requirement. Meanwhile, the township had, between the 1965 and 1967 hearings, installed 2,000' of water mains along Center Street. About half the length of the water main the company planned to install along Center Street to the proposed well site would parallel the entire 2,000' length of the township's main. (It would appear from the record that since the township proposed to extend its existing main and install new mains, to grant the company's application would involve a further paralleling of water mains in this area of the township.)

Roxbury Township's witnesses were its consulting sanitary engineer and the chairman of its sewer and water utility

committee, who was also a member of the township committee and township planning board. Their testimony was to the effect that the proposed well would seriously interfere with the integrated system the township was then in the process of establishing. That system called for the condemnation of all private water company property and the distribution of all water in the township by a municipally-owned utility. Their testimony also tended to contradict directly that of Shore Hills' engineer.

Following the hearing the attorneys for the company and the township submitted summations in letter form. The three members of the Council who had heard the testimony prepared a summary of the evidence and a recommended resolution which was incorporated in the resolution adopted by the Council on March 23, 1967 denying the company's application without prejudice.

The resolution here under review recited, among other things, that the Council had in its deliberations taken into consideration the records of the hearings on the respective applications of the township in 1961 and the water company in 1965; that the company's proposed well was located 3,500′ outside its franchised area and within 1,700′ of the township's existing well, which would involve construction of a transmission main paralleling throughout half its length the township's existing water main; that the company wanted the additional water as a standby supply in case one of its two wells failed or a water main broke; that a standby facility by way of interconnection with the township was available to supply the quantity of water the company was authorized to use; and, finally, since those being served by the company did not have proper or adequate sewage disposal facilities and were presently using septic systems which threatened to contaminate not only their own surface and subsurface resources but those of the surrounding areas as well, it was not considered advisable to grant the company's application until such time as adequate sewerage services were available.

## II

In an effort to conserve and most effectively use the water resources of New Jersey, the Legislature established the State Water Policy Commission. See *R. S.* 58:1–1 *et seq.,* as amended. All the functions, powers and duties of the Commission were subsequently transferred to the Division of Water Policy and Supply, of which the Water Policy and Supply Council is the deliberative body. *N. J. S.* 13:1A–9, 13:1B–50.

An application to tap any natural water source must be made to the Council, *R. S.* 58:1–18. A hearing is held and objections filed, *R. S.* 58:1–19. The Council then determines whether the application is justified by "public necessity," *R. S.* 58:1–20, and it may approve, modify or deny the request, *R. S.* 58:1–21. Any party aggrieved by the decision may seek review by a proceeding in lieu of prerogative writs, as in this case, *N. J. S. A.* 58:1–22.

## III

Shore Hills argues that the denial of its application was not justified by facts properly before the Council. It is first contended that Council's consideration of the records of the hearings on the two prior applications (in 1961 and 1965) was improper and in violation of fundamental procedural requirements.

At the conclusion of the January 9, 1967 hearing on Shore Hills' latest application, the attorney for Roxbury Township moved to introduce into evidence "all the exhibits * * * within the possession of the Council that were introduced by the Township of Roxbury * * * under Application Number 1067, and that consisted of two hearings * * *" and, after some further explanation, "the exhibits that were introduced at the hearing of the application of the Shore Hills Water Company under Application 1231, which is really and essentially and actually the very same application that is being made here today." When the attorney for Shore Hills ob-

jected, the township attorney pointed out that the company participated in each of the prior hearings and was supplied with copies of the exhibits. At this point the deputy attorney general representing the Division of Water Policy and Supply expressed the opinion that "the previous records of any applications that may have some bearing on this hearing may be taken into consideration by the Council" without the necessity of introducing them as part of the record of the proceedings. The township attorney found that arrangement "satisfactory." The chairman then stated that the Council would use "its own best judgment" in considering the prior records, and noted that "almost all present at this hearing have been at the other hearings also." There was no further objection on the part of Shore Hills.

We perceive no ground for the complaint presently made by the water company. Shore Hills' argument is that the prior records were irrelevant and immaterial, and any consideration given them by the Council denied the company the right of cross-examination. To this it adds a policy thrust — that under *Rule* 4 of our *Rules of Evidence* (1967) matters not of demonstrated probative value should not be allowed to swell the record unduly.

That the prior records were not actually introduced in evidence, but that the Council took official notice of its prior proceedings, is not of significant importance. The true question is whether the administrative agency, in looking beyond the four corners of the record then made before it, substantially prejudiced either of the parties. *United States v. Pierce Auto Freight Lines,* 327 *U. S.* 515, 66 *S. Ct.* 687, 90 *L. Ed.* 821 (1946), cited with approval and quoted to that effect by our Supreme Court in *Pennsylvania Railroad Co. v. Department of Public Utilities,* 14 *N. J.* 411, 428 (1954).

It is significant that in the latter case the court, in finding that the railroad was not prejudiced because during the course of the departmental hearing it was not put on notice that official notice would be taken by the agency of certain related prior proceedings, said that the railroad was fully

aware of those proceedings because it had in considerable measure participated therein. 14 *N. J.*, at page 429. Quoting from *Pierce Auto*, the court continued:

"In the absence of any showing of specific prejudice, the claim comes down to the highly technical objection that the Commission, in the final stage of forming its judgment, could not in either case take account of what had been done in the other, notwithstanding the closely related character and objects of the applications and the prior proceedings. The contention in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left hand may be doing.

Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders." (at *pages* 429–430)

In the present case the position of Shore Hills is even less compelling. It had notice at the hearing that the Council would take official notice of the prior hearings. Shore Hills participated in all those hearings and therefore had the opportunity of meeting the township's offers of proof by cross-examination and rebuttal, in furtherance of precisely the same interests as it advances in the present case. Since the subject matters of the prior proceedings were the same or directly related to that before the Council in the present application, it is difficult to understand Shore Hills' argument that the matters previously considered were irrelevant and immaterial. *Cf. R. S.* 58:1–14.

Official notice has long been a respected part of administrative deliberations, both in New Jersey and under federal administrative law. See *Pennsylvania Railroad Co. v. Department of Public Utilities,* above. Thus, approval of its use here, rather than opening a Pandora's box (appellant's reference) and permitting irrelevancies to cloud real issues and clog the record on appeal, follows respectable precedents which acknowledge a salutary power of administrative agencies — a power which greatly contributes to the effective completion of their appointed tasks. *Ibid.*

No prejudice has been demonstrated by Shore Hills. Such is its burden if it may successfully attack Council's

right to take official notice of directly related proceedings previously before it. Having failed to carry this burden, its argument must fail.

## IV

Shore Hills next argues that there was not sufficient evidence to support Council's denial of the application. It takes issue with that part of the resolution which recites that the company desires the requested quantity of water as a standby supply in case of the failure of one of its two wells, or a water main break. On direct examination Shore Hills' expert, engineer Borghard, was asked what amount of storage or water diversion was considered necessary for the company to be prepared for an emergency such as a main break or a fire. His reply was that the storage available was, in his opinion, sufficient and that he would not recommend additional storage. Rather, "we need the ability to replace the largest [well] plus additional supply for increased per capita use, expansion on the system, and unusual conditions of drought, fire or main failure."

As to this first alleged erroneous finding, it is clear, on the basis of ample evidence, that Shore Hills' present capacity well exceeds actual need. It has two wells producing about 300 gallons a minute (the daily figure given was 346,000 a day), while the average daily consumption rate is 137 gallons a minute. In addition, there is available the 315,000 gallons held in the two storage tanks. The purpose of that storage, said Borghard, is "to take out the peaks for the day."

Considering the rated capacity as compared to the rate of consumption, as well as the existence of the 315,000 gallons of stored water (an amount exceeding the number of gallons used on the highest-use day of four 1966 months, and only 135,000 less than the highest use on a single day of that year), together with Borghard's testimony that the new well was needed to supplement the present sources, we conclude that the challenged finding was proper.

The second Council finding complained of is that part of the resolution which states that "a standby facility in the form of an interconnection with the Township of Roxbury is available to supply the quantity of water which the applicant is now authorized to use." The testimony of the chairman of the township's sewer and water utility committee made it explicit that such an interconnection would be available for standby purposes.

"* * * the water which we are developing now and which we have available is not only available to our own individual customers and consumers but also would be available to anyone who had a need for it, including any other water company which may need it as a supplemental system or supply."

Shore Hills has now embraced that offer. In June 1967 it filed a petition for interconnecting its system with the township's, requesting that Council issue an interconnection order under *R. S.* 58:1–25.

Finally, Shore Hills attacks the finding that its customers lack proper or adequate sewage disposal facilities; that they are presently using septic systems which threaten to contaminate their own surface and subsurface resources as well as those in the surrounding areas, so that it was not considered advisable to grant the company's application until such time as adequate sewerage services were available. The company claims that the sewage problem was mentioned only once in passing. To the contrary, we find the subject mentioned at various points in the record. The problem of the inadequacy of sewerage facilities in the township has long concerned the governing body. Its consulting sanitary engineer testified to the importance of installing sanitary sewers throughout the township, and discussed the status of the plans therefor. The water company's witness disclosed that only septic tanks were in use in the franchised area. One of the Council members observed that eventually the septic tanks would "pollute the whole area."

The Council was familiar with the urgent pollution problem that had developed in the area of the township immediately south of Shore Hills' franchised area. In the report filed by the Council members who conducted the hearing, reference was made to those portions of the stenographic record of the hearing on the township's 1961 application which dealt with the pollution problem and the township's plans to alleviate the condition. Thus, as the township's appellate counsel points out, when one of the Council members in the course of the hearing raised the problem of contamination he was directly calling attention to a factor of deep concern. This is borne out by the resolution adopted by the Council just two months after it had determined the water company's application. That resolution reflects the expert knowledge previously developed by the Council to the effect that "the water resources * * * of the State are rapidly becoming subject to severe contamination and pollution because of the intensive and burgeoning growth and development taking place throughout the State." The resolution further states that "to ameliorate this ominous threat to the State's water supply and the resultant effect upon the health of our citizens, more effective sewage and waste treatment facilities are essential." The Council therefore resolved that it would not approve any proposed plan for water supply development or allocation, absent sufficient evidence that adequate waste disposal facilities will be provided.

The Council does not operate in a vacuum. It is an agency with presumed expertise in the entire field of water supply — from the tapping of sources, through distribution of water, to the eventual return of the water after its use. Thus, *R. S.* 58:1–11 states as part of the purposes of the State Water Supply Commission, of which the Council is successor,

"* * * to complete a comprehensive study for the entire state, for the conservation, development, regulation and use of the waters, in each of the principal watersheds of the state with reference to the accomplishment of * * *:

a. the supply of pure and wholesome water from the watersheds to the municipalities and the inhabitants thereof and the *disposal of sewage and wastes which may affect the supply.*
\*   \*   \*   \*   \*   \*   \*   \*   \*"    (Italics ours)

An agency with the expertise commanded under this statute is within the proper bounds of its authority in finding that the existence of septic tanks in Shore Hills' franchised area will contaminate the water sources in that locale. Not only upon the basis of what had indisputably been developed at the hearing, but by reason of its previously acquired knowledge of sewerage conditions in the area, the Council was amply warranted in resolving that it was inadvisable to grant the company's application until adequate sewerage service was available. Our courts do not require an administrative agency to act upon particular applications with eyes and mind completely averted from a known situation.

Our Supreme Court only recently recognized that in the discharge of its legislative mandate, and with particular regard to pollution prevention, the Council "has the power and duty to protect the source of State water supply from contamination"; the Council and its agents, it said, had developed "a singular expertise and are unusually qualified to pass judgment on that subject." *Juzek v. Hackensack Water Co.,* 48 *N. J.* 302, 310–311 (1966).

See also *Jersey City v. State Water Policy Comm'n,* 118 *N. J. L.* 72 (*E. & A.* 1937). This was an appeal from a State Water Policy Commission hearing at the outset of which the Attorney General advised the Commission that it lacked jurisdiction concerning "the question of the sanitary condition of water" and that "the contamination of such water, after impounding, is for departments other than yours." The court held this to be "a fundamental misconception of the expressed legislative policy," stating that the Commission was "designed to lay down a broad and comprehensive policy for the conservation and protection of the 'surface, subsurface and percolating waters of the state' through control and regulation of the 'use, development and

diversion' of such waters." See *R. S.* 58:1–10, and note *R. S.* 58:1–18 (second paragraph) and *R. S.* 58:1–20. In discussing the question of the purity of water and what department had general supervision over that problem, the court went on to say that

" * * * the purity of the state's potable water supply is of necessity a pre-eminent factor in the valid exercise of the powers thus conferred upon the commission. The legislature, by this enactment [*L.* 1929, *c.* 267, now *R. S.* 58:1–1 *et seq.*], recognizes that the safeguarding of such water sources and streams against pollution is a primary function of government. The toll in health, and life itself, of disease-laden waters devoted to potable uses is immeasurable. And the economic waste, to say nothing of the grave individual consequences of such contamination, is likewise incalculable. Assuming, but by no means conceding, that the letter of the statute is ambiguous. it is implicit therein that qualitative as well as quantitative considerations shall govern the commission in the discharge of the duties laid upon it. And the former plainly have dominance. * * *" (118 *N. J. L.*, at *pages* 75–76)

## V

█ As a second major contention, Shore Hills argues that the Council has no power to deny subsurface diversion because of inadequate sewerage facilities in the area served. The difference between this argument and the one just discussed lies in its emphasis upon lack of authority rather than whether sufficient evidence of the nonexistence of such facilities would support the Council's finding.

Sufficient authority to deny the application for the reason stated by Council may be found in *R. S.* 58:1–1 *et seq.*, as amended, and specifically in *R. S.* 58:1–11(*a*).

The water company would have us find a distinction between the Council's control over surface as opposed to subsurface sources of potable water. Surely, subsurface waters are entitled to the same protection as surface waters, for were this not true, Council would not have had the power to pass upon Shore Hills' application since it involves a subsurface source. *R. S.* 58:1–10 undercuts the company's present claim. It states:

"The commission [now Council] shall have general supervision over *all* sources of potable and public water supplies, *including* surface, *subsurface* and percolating waters, to the end that the same may be economically and prudently developed for public use." (Italics ours)

Shore Hills contends that this statute was not included in the grant of power to the Council under *N. J. S. A.* 13:1B–50. It has apparently overlooked *N. J. S. A.* 13:1A–9, which provides, in pertinent part, that "the functions, powers and duties, records and property of the State Water Policy Commission \* \* \* are hereby transferred to and vested in the Division of Water Policy and Supply established under this act [*L.* 1945, *c* 22], to be exercised and used by the council thereof, in accordance with the provisions of this act."

There can be no doubt that the Council acted in the exercise of the general supervisory authority granted it by *R. S.* 58:1–10. This position is supported by the *Jersey City* and *Juzek* cases referred to above.

In asserting that the Council lacks specific power over subsurface waters in relation to septic tanks or sewerage contamination, Shore Hills would avoid a determination of the question by that agency on a claim that jurisdiction properly lies in the State Department of Health. By removing the matter from consideration by the Council it would gain the right to tap a new water source while another agency was in the process of considering the contamination issue — a decisional process which might well take a considerable time. Before any such determination could be made, condemnation of its property by the township would inevitably have taken place; the matter would be moot insofar as Shore Hills was concerned and the problem have become one for the township to meet. In the meantime, the water company would enjoy increased diversion rights, at a profit to itself.

We cannot subscribe to any strained reasoning which would effectuate so transparent a plan. We find nothing in *R. S.* 58:1–1 *et seq.,* as amended, to justify a holding that Council lacks the power to deny an application on the ground

that septic tanks will pollute the water source, and therefore no increased diversion will be granted until proper facilities exist. The statute runs directly contrary to such a theory and to the broad construction that must be given the legislation if it is to achieve its salutary purposes. The only reasonable conclusion is that Council had complete power to make the challenged determination.

The decision is affirmed in all respects.