**R–C MOTOR LINES, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. No. 72–132.

United States District Court,
M. D. Florida,
Jacksonville Division.

Nov. 10, 1972.

Lawrence D. Fay, Jacksonville, Fla., for plaintiff.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Walker B. Comegys, Acting Asst. Atty. Gen., John H. D. Wigger, Atty., U. S. Dept. of Justice, Fritz R. Kahn, Gen. Counsel, I. C. C., Charles H. White, Jr., Atty., I. C. C., Washington, D. C., for defendants.

Before SIMPSON, Circuit Judge, and McRAE and SCOTT, District Judges.

## OPINION AND ORDER

CHARLES R. SCOTT, District Judge:

Jurisdiction of this three-judge case is founded upon 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325, inclusive, upon 49 U.S.C. § 305(g) and upon 5 U.S.C. § 701. The Interstate Commerce Commission has ruled that R–C Motor Lines, Inc. cannot serve Chesapeake, Virginia, under its existing authority, and plaintiff asks that the Commission's order be set aside.

An abbreviated history of this case follows. Plaintiff, R–C Motor Lines, Inc., a Florida corporation (R–C), is a motor common carrier, subject to the Interstate Commerce Commission (ICC), operating between specified points in 14 states and the District of Columbia, pursuant to certificates of public convenience and necessity issued by the Commission in Docket No. MC–75651 and in various sub-numbers thereunder.

R–C began its operations in this area as an irregular route carrier.[1] As is the case with many such carriers, its operations regularized during the course of its development and R–C converted its certificated authority from the irregular route type to the regular route type.[2]

Section 208 of the Interstate Commerce Act provides that the Commission, in issuing a regular route motor carrier certificate, shall specify the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, the carrier is authorized to operate. 49 U.S.C. § 308.

Pursuant to this authority the Commission issued a certificate which provided, *inter alia*, that R–C serve:

[A]ll points in Georgia, North Carolina, and South Carolina, and those in New Jersey within 25 miles of Newark (including Union, New Jersey) as off-route points in connection with carrier's regular-route authority.

R–C contends that its authority to serve all points in North Carolina as off-route points includes Moyock, North Carolina, and it can therefore serve the commercial zone of Moyock which includes Chesapeake, Virginia, despite the lack of any explicit authority to operate in Virginia.

The Commission takes the position that authority to serve "points in . . . North Carolina" limits R–C's

---

1. Generally an irregular route carrier provides a call-on-demand service within a territory, while a regular route carrier operates over established routes pursuant to a fixed schedule.

2. ICC Docket No. MC–75651 (Sub. No. 58).

service to points within certain boundaries, and that authority so limited to a definite territory cannot be construed as allowing any service at any points beyond the limits prescribed.

On June 17, 1968, R–C was advised by the Commission's Bureau of Operations that its operations into Virginia were unauthorized, and the Bureau recommended that R–C's service into Chesapeake, Virginia, be discontinued. The carrier refused to discontinue these operations.

On November 9, 1970, the ICC instituted an investigation, pursuant to 49 U.S.C. §§ 304(c) and 312(a), into the motor carrier operations of R–C Motor Lines.[3] At this stage the Bureau of Enforcement entered the proceeding and the case was presented to a hearing examiner on stipulated facts. He found that R–C had no authority to serve Chesapeake, Virginia.[4]

Division 1 of the Commission affirmed the examiner's report and ordered R–C to cease and desist from the transportation of regulated commodities to and from Chesapeake, Virginia.

R–C then filed this lawsuit and a temporary restraining order was entered enjoining the enforcement of the Commission's order pending judicial review.

## SCOPE OF JUDICIAL REVIEW

The scope of judicial review of the Interstate Commerce Commission's interpretation of its own certificate is very narrow. Interpretations of certificates of public convenience and necessity issued by the ICC should be made in the first instance by the Commission,[5] and the Commission's determination is entitled to be upheld on judicial review if supported by substantial evidence.[6] The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L. Ed. 1305 (1942).

Substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939). This standard of review was deliberately adopted by Congress in Section 10(e) of the Administrative Procedure Act, 5 U. S.C. § 706(2)(E). It was intended to give proper respect to the expertise of the administrative tribunal and to help promote the uniform application of agency rules.[7]

The structuring and interpretation of a certificate of public convenience and necessity is an exercise of the Commission's special expertise. A presumption of validity attaches to such an exercise of expertise, and those who would overturn the Commission's judgment undertake the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Permian Basin Area Rate Cases, 390 U.S. 747, 88

---

3. ICC Docket No. MC–C–7143.

4. "Since the certificate held by respondent does not specifically authorize service at Moyock, N. C., either as a regular route or off-route point and applicant's authority to serve that point is included in the description of service as points in North Carolina, it is the examiner's opinion that respondent herein [R–C Motor Lines, Inc.] is not authorized to serve points in Virginia within the commercial zone of Moyock, N. C." Report of Hearing Examiner in Docket No. MC–C–7143.

5. Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed. 2d 717 (1959).

6. Illinois Cent. R. R. v. Norfolk & W. Ry., 385 U.S. 57, 87 S.Ct. 255, 17 L.Ed. 2d 162 (1966); Ryder Truck Lines, Inc. v. United States, 308 F.Supp. 341 (M.D.Fla.1969); McDowall Transport v. United States, 130 F.Supp. 681 (S.D. Fla.1955).

7. *See* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

S.Ct. 1344, 20 L.Ed.2d 312 (1968). In the absence of exceptional circumstances, the Commission's interpretation of a certificate of convenience and necessity issued by it will not be overturned. Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959).

The function of the reviewing Court is very restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done.[8] It cannot substitute its own view concerning what should be done for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

Substantial evidence on the record supports the decision of the ICC that plaintiff has extended motor carrier service beyond the limits authorized in the certificate of public convenience and necessity.

## CONSISTENCY OF AGENCY DECISIONS

■ Although the doctrine of *stare decisis* does not apply to decisions of administrative bodies, consistency of administrative rulings is essential, for to adopt different standards for similar situations is to act arbitrarily. Mary Carter Paint Co. v. Federal Trade Comm'n, 333 F.2d 654 (5th Cir. 1964). On the basis of this reasoning R–C founds its argument that the ICC has taken a position in earlier cases that is inconsistent with its position in the instant case, and, therefore, R–C is entitled to the same treatment granted carriers in the earlier cases. R–C relies principally upon the unreported cases of

Bell Lines, Inc. Route Conversion Application,[9] and Standard Trucking Co. Route Conversion Application.[10]

In the *Bell* and *Standard* cases, as in the instant case, the carriers held irregular route certificates and filed applications to convert to regular route status. R–C Motor Lines, Inc. opposed the carriers' applications in *Bell* and *Standard*, arguing that in the conversion proceedings the carriers' authority should not be broadened to permit service to areas beyond the state boundaries that they were then authorized to serve. The Commission in *Standard* added a specific restriction onto the carrier's certificate prohibiting service in commercial zones across state lines.

> RESTRICTION: The authority granted herein to serve points in North Carolina and South Carolina is restricted against the provision of service at those portions of the commercial zones as defined by the Commission of such points which be outside the States of North Carolina and South Carolina.[11]

This restriction was grounded on the reasoning that the carrier's authority was territorial in nature and did not permit it to offer service at those portions of the commercial zones located outside the named states.[12] When a territorial grant is awarded, the carrier cannot provide service beyond those limiting boundaries. Operations under a territorial grant are designed to provide service to a specific area, generally of some substantial size, and the limits of the operations authorized are expressly restricted to the confines of the territory granted. Houff Transfer, Inc. Extension, 78 M.C.C. 511, 516 (1958); Commercial Zones and Terminal Areas, 54 M.C.C. 21 (1952).

---

8. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942).

9. ICC Docket No. MC–1375 (Sub. No. 11).

10. ICC Docket No. MC–39973 (Sub. No. 1).

11. *Id.*

12. In Transportation Activities of Tornetta, 48 M.C.C. 637 (1948), the Commission provided a clear guide to interpreting territorial grants by specifying eleven such provisions. The first of these eleven territorially limited forms corresponds with the one employed in this case.

In the *Bell* case, *supra*, the Commission ordered that:

[A] certificate be issued to applicant authorizing operation, in interstate or foreign commerce, as a common carrier by motor vehicle . . . subject (2) . . . to the further conditions . . . (b) that the authority granted herein authorized to serve points in South Carolina is restricted against the provisions of service at those portions of the commercial zones as defined by the Commission of such points which lie outside of the State of South Carolina.

In both the *Bell* and *Standard* cases the limiting language in the carrier's certificate was added at R–C's behest. R–C now contends that the lack of such restriction in its certificate indicates the Commission intended it to be able to service the commercial zone surrounding Moyock, North Carolina, which includes Chesapeake, Virginia.

 The answer to this contention is that the certificates in *Bell* and *Standard* contained the legally correct, but totally redundant, restrictions on service. The specific restrictions were mere surplusage, intended to clarify the territory the carriers could service. The presence or lack of such limitations does not extend or decrease the territory available to the carrier. Thus, it is immaterial that R–C's certificate contained no such restriction; it was a territorially limited certificate either with or without the specific wording of limitation.

There is no inconsistency between the Commission's orders in *Bell* and *Standard,* and the order in the instant case sufficient to justify overturning the Commission order herein as arbitrary.

In the case of Commercial Zones and Territorial Areas, 54 M.C.C. 21, 92–93 (1952), which involved a situation substantially similar to the issues in this case, the Commission said:

Despite the conclusion that authority to serve a particular municipality may be construed as authority to serve also all contiguous or adjacent points or places which are within the commercial zone of the authorized municipality, *operating authorities which are definitely limited to particular territory cannot under any circumstances be construed as implied authority to serve in any way any points or places which are, in fact, beyond the described, even though such a point or place is contiguous, or so adjacent, to a municipality located in authorized territory as to be within the commercial zone thereof.* Thus, for example, a motor carrier authorized to serve all points in Arkansas, but not points in Texas or Oklahoma, may not properly serve in any manner any point or place in Oklahoma adjacent to Fort Smith, Ark., or in Texarkana, Tex., which is contiguous to Texarkana, Ark.

The argument that a carrier authorized to serve, for example, all points in Ohio should be deemed to have authority to serve all points in the Cincinnati commercial zone including Covington, Ky., which is contiguous, has its greatest appeal when made in connection with the collection and delivery of less-than-truckload traffic, but as above indicated any construction of operating authorities must apply alike to both truckload and less-than-truckload traffic. Clearly a grant of authority subject to territorial limits, if the limits mean anything, requires that door-to-door truckload service shall stop at the prescribed limits. If truckload service must stop for want of authority, so must less-than-truckload service, for both are performed under the same authority. [Emphasis added].

The Court has discovered nothing which would indicate that the ICC has abandoned this position.

In a recent case before a three-judge district court in Colorado the court ruled that where a motor carrier's regular route certificate authorized the carrier to serve numerous points in California the certificate was not ambiguous and

did not permit the carrier to serve Reno, Nevada.[13]

## CONCLUSION

■■■■ R–C concedes that prior to conversion from irregular route status to regular route status it could not serve Chesapeake, Virginia.[14] The rule is clear that by converting from irregular to regular route operations a carrier does not broaden the territory it is authorized to serve.[15] Thus, by virtue of converting its certificate, R–C did not expand its authorized area of service to include Chesapeake, Virginia.

While R–C may service Moyock, North Carolina, as an off-route point included within its regular route authorization, it may not service Chesapeake, Virginia, which is beyond the area included within the territorially limited certificate.[16] The absence in the certificate of specific authority to service Moyock, either as a regular route or off-route point, and applicant's authority to serve that point under the general description of "all points in . . . North Carolina", precludes R–C from serving points in Virginia within the commercial zone of Moyock, North Carolina. Therefore, it is

Ordered:

1. The cease and desist order of the Interstate Commerce Commission, served on August 17, 1971, is upheld.

2. The temporary restraining order, entered herein on March 28, 1972, is hereby dissolved, vacated and set aside, effective 15 days from the date of this order. The delay is granted so as to permit orderly application to the Supreme Court, or a Justice thereof, for stay of our order pending appeal.

3. This action is dismissed, with prejudice, at the cost of the plaintiff.

---

13. Ringsby-Pacific, Ltd. v. United States, 334 F.Supp. 1403 (D.Colo.1971).

14. "Respondent cannot disagree that if a carrier holds authority over irregular-routes to serve a defined geographical territory, it is limited to that specific boundary and may not avail itself of terminal area provisions to go beyond". Respondent's Exceptions to Examiner's Report, R–C Motor Lines, Inc., MC–C–7143.

15. Midwest Motor Express, Inc. Extension Intermediate Points, 96 M.C.C. 402 (1965).

16. "It is fundamental that authority to serve any off-route point is part of the authorized regular route service. It, therefore, follows that off-route point service, when unrestricted, authorizes the same service to and from each authorized "off-route" point as that authorized over the regular route either at terminal or at intermediate point". Ferguson Freight Lines, Inc. Modification of Certicate, 61 M.C.C. 87 (1952).