PUERTO RICO PORTS AUTHORITY,
Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Seatrain Lines of Puerto Rico,
Inc., Intervenor.

PUERTO RICO MARITIME SHIPPING
AUTHORITY, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Seatrain Lines of Puerto Rico,
Inc., Intervenor.

PUERTO RICO MARITIME SHIPPING
AUTHORITY, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Seatrain Lines of Puerto Rico, Inc.,
Seatrain Gitmo, Inc., Intervenors.

PUERTO RICO PORTS AUTHORITY,
Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Seatrain Lines of Puerto Rico, Inc.,
Seatrain Gitmo, Inc., Intervenors.

Nos. 78–1950, 78–1969, 78–1970
and 78–1978.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1979.

Decided June 10, 1980.

Rehearing Denied July 22, 1980.

472

Amy Loeserman Klein, Washington, D. C., with whom Morris R. Garfinkle, Suzette Matthews, and Charles Friedlander, Washington, D. C., were on brief, for petitioner in Nos. 78–1950 and 78–1978.

John T. Schell, Washington, D. C., with whom Lewis A. Rivlin, David J. Taylor, and Lawrence White, Washington, D. C., were on brief, for petitioner in Nos. 78–1969 and 78–1970.

Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., with whom C. Jonathan Benner, Atty., Federal Maritime Commission, Washington, D. C., was on brief, for respondent, Federal Maritime Commission in Nos. 78–1950, 78–1969, 78–1970 and 78–1978.

Neal M. Mayer, Washington, D. C., with whom Paul D. Coleman and David S. Healy, Washington, D. C., were on brief, for intervenor in Nos. 78–1950, 78–1969, 78–1970 and 78–1978.

Also John J. Powers, III, Robert J. Wiggers, and Barry Grossman, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America, in Nos. 78–1950, 78–1969, 78–1970 and 78–1978.

Before McGOWAN, Circuit Judge, LUMBARD,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit, and MIKVA, Circuit Judge.

Opinion for the court filed by Circuit Judge McGOWAN.

Opinion dissenting filed by Senior Circuit Judge LUMBARD.

McGOWAN, Circuit Judge.

These consolidated cases arise on petition for review of two Federal Maritime Commission (FMC or Commission) decisions that resulted from a controversy surrounding two high-speed container cranes located on berths at the "Isla Grande" terminal at the port of San Juan, Puerto Rico. In FMC Docket No. 76–38 the Commission found that the Puerto Rico Ports Authority (Ports Authority) and the Puerto Rico Maritime Shipping Authority (PRMSA) had violated section 15 of the Shipping Act, 46 U.S.C. § 814 (1976), through their failure to secure Commission approval of agreements concerning the use of terminal facilities. In FMC Docket No. 76–41, the Commission found violations of sections 16 and 17 of the Shipping Act, 46 U.S.C. §§ 815, 816 (1976), through the Ports Authority's failure to condition PRMSA's use of the terminal on, and PRMSA's failure to allow, sharing of PRMSA's high-speed container cranes by a competing carrier. For the reasons hereinafter appearing, we reverse the Commission as to each of the violations determined by it to exist.

I

The Puerto Rico Ports Authority, established by the Puerto Rico Legislature in 1942, is a public corporation charged with the ownership, development, and operation of transportation facilities and marine services in, to, and from Puerto Rico. It holds the sole authority to select and assign suitable berths to vessels calling at the Port of San Juan.

The Puerto Rico Maritime Shipping Authority, established in 1974, is a nonstock

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

public corporation organized to provide ocean common carrier service between mainland United States and the Commonwealth of Puerto Rico. To implement its operation, it acquired vessels, equipment, and terminal leasehold improvements from several container carriers. These included Seatrain Lines, Inc., which had owned the facilities at Isla Grande, as well as Sea-Land Service, Inc., and Sea-Land's affiliate Gulf Puerto Rico Lines, Inc. In addition, PRMSA acquired the outstanding stock of the roll on/roll off carrier Transamerican Trailer Transport, Inc. In October 1974, PRMSA began carrier service between San Juan and the Atlantic and Gulf Coasts of the United States.

Seatrain Gitmo, Inc. is a subsidiary of Seatrain Lines, Inc., whose assets PRMSA had acquired at the outset of its carrier service. Both are intervenors in this litigation and are referred to collectively as Seatrain. After having left the Puerto Rico-mainland trade with the sale of assets devoted thereto in 1974, Seatrain reentered that trade between Atlantic ports and Puerto Rico in January 1976. Its reentry and concomitant request for berthing facilities in Puerto Rico precipitated this litigation.

The Port of San Juan comprises a number of terminal facilities, among them Isla Grande, Puerto Nuevo, Pan American Dock, Frontier Pier, and Puerto Rican Drydock. For containership operation, Isla Grande and Puerto Nuevo assume the most significance; Isla Grande, however, is the focus of this litigation.

Isla Grande terminal has been used for containership operation since 1962, and its rather unique configuration is critical to the FMC decisions under review. Isla Grande has two 663 foot berths, which are contiguous end to end. Extending along the water side of the wharf for the length of the berths is a "dip," 15–22 feet wide and 1½–3 feet lower than the bulkhead (the beginning of the wharf structure at the water line) and the remainder of the wharf. Steel "bitts" or piles, 2½ feet high and 2 feet in diameter, are located every 100 feet along the center of the dip. The presence of this

dip affects the use of the terminal. Ship-mounted cranes can be used effectively only if they have the reach necessary to place cargo over the dip. Mobile cranes, which might otherwise operate within the dip, are impeded by the bitts, which are used to moor vessels. To circumvent these difficulties, two parallel crane rails, designed to accommodate shoreside container cranes, are embedded on the wharf, the first almost next to the dip, and the second, in back of the first. High-speed shoreside cranes, owned by Seatrain until PRMSA purchased them in 1974, are installed on these rails. Behind the 250 foot wide wharf is a marshalling area of approximately 21 acres. The entire terminal occupies approximately 35 acres.

Puerto Nuevo, the newest docking area in the Port of San Juan, has been planned and developed as the major container facility in the port, with the potential for future expansion. The Ports Authority has constructed ten berths at Puerto Nuevo, four of which have been in use throughout the Commission's proceedings in these cases. Parallel crane rails extend across these four berths (E, F, G, H) and across two others (J, K) that have not been used for container operations. The remaining Puerto Nuevo berths have no crane rails, but are designed to accommodate them.

In developing docking facilities at the Port of San Juan, the Ports Authority has adopted a passive approach. Instead of providing all the facilities essential to container shipping, it opted to develop the harbors, wharves, and channels and to offer only berths and wharfing areas to the carriers. Any further improvements essential to containership operations were to be installed by the carriers themselves, to suit their individual needs. Such improvements might include crane rails and container cranes, pavement of backup land, lighting, fencing, and any necessary buildings. The Ports Authority protected the carriers' investments by offering long-term agreements for preferential use of the berths and adjacent wharves, and long-term exclusive leases of backup land.

Modern containership operation depends on the availability of container cranes, either shoreside, mobile, or ship-mounted, for the efficient handling of cargo. Although containership operations began at the Port of San Juan in the early 1960s, high-speed container cranes were installed only later, by the carriers themselves in accordance with the Ports Authority's passive development plan. The agreements negotiated with individual carriers regarding the use of those cranes reflected the gradual development of the port for container shipping. Prior to the installation of cranes at Puerto Nuevo, for example, the Ports Authority had executed, with both Seatrain at Isla Grande and another carrier, Sea-Land Service, Inc., long-term agreements that required no equipment sharing. After Sea-Land installed high-speed cranes at Puerto Nuevo in 1965, the Ports Authority required Sea-Land to operate those cranes for other carriers, if such use would not interfere with Sea-Land's own operations. In 1975, however, when the Ports Authority negotiated new agreements for Puerto Nuevo with Sea-Land and with PRMSA (partial successor to Sea-Land at Puerto Nuevo), the agreements required no crane sharing. By then the Ports Authority had developed enough berths at Puerto Nuevo so that it could offer facilities on which containership carriers could install their own cranes and other equipment. No longer was crane sharing necessary to ensure access to the Port of San Juan for all container carriers.

Because Isla Grande is the focus of this controversy, a more detailed account of the situation existing at that terminal is required. In accordance with the Ports Authority plan for developing the Port of San Juan, Seatrain helped to improve the Isla Grande terminal. It installed crane rails, container cranes, paving, and other improvements. According to the terms of a 15-year agreement executed in 1972,[1] title to these improvements, with the exception of the crane rails, would remain in Seatrain

until the expiration of the agreement. Title to the crane rails, in contrast, was to vest immediately in the Ports Authority. In 1974 at Seatrain's request, the Ports Authority released title to the crane rails so that Seatrain could sell them to PRMSA. Thus, when PRMSA entered the carrier trade in late 1974, it purchased Seatrain's vessels and terminal assets, including the cranes and crane rails. For the crane rails, PRMSA paid $512,554.93; for the cranes, $2,204,223.74.

Like the pre-1975 agreements executed for the Puerto Nuevo berths, the 1972 agreement between the Ports Authority and Seatrain for Isla Grande had included a crane sharing requirement: if the Ports Authority determined that crane sharing would not interfere with Seatrain's operations, the Authority could require Seatrain to furnish crane service to other carriers. The Ports Authority invoked this provision only twice, for noncommercial vessels. J.A., at 668.

When PRMSA purchased Seatrain's assets in 1974, Seatrain demanded release from its 1972 agreement. The Ports Authority consented only after PRMSA had committed itself to assume, but had not actually assumed, Seatrain's obligations under the 1972 agreement. When the Ports Authority and PRMSA finally executed an agreement in 1976, however, that agreement did not include the crane-sharing obligation. The Ports Authority attributes its failure to require secondary crane use to the pressing financial need for a signed lease for the Isla Grande terminal and, more importantly, to the inconsistency of a crane-sharing requirement with both the Ports Authority's overall plan for the development of the Port of San Juan and the availability of unimproved berths at Puerto Nuevo. This lack of a secondary use requirement and PRMSA's refusal to share its cranes voluntarily with Seatrain, its predecessor at Isla Grande and now its competi-

---

1. Neither the 1972 Seatrain lease nor the agreement terminating it was filed with or approved by the Commission. In FMC Docket No. 76–38, the Commission found both to constitute violations of section 15 of the Shipping Act, 46 U.S.C. § 814 (1976). Neither violation has been appealed to this court.

tor, led to the Commission's finding of sections 16 and 17 violations. In addition, the Commission found that PRMSA and the Ports Authority had implemented an agreement for the use of Isla Grande without prior Commission approval, in violation of section 15 of the Shipping Act.

## II

Section 15 of the Shipping Act, 46 U.S.C. § 814 (1976), ensures Federal Maritime Commission supervision of designated classifications of agreements pertaining to the common carriage of goods by water. It requires such agreements to be filed with the Commission promptly; vests in the Commission the power to approve, disapprove, cancel, or modify the agreements; and provides that the agreements can be

implemented lawfully only after Commission approval.[2] The requirements of section 15 extend to every "common carrier by water, or other person subject to this chapter."[3] No one disputes that both the Ports Authority and PRMSA come within its purview. Moreover, those parties concede that agreements in which a terminal operator grants a carrier preferential berthing rights in a marine terminal facility require section 15 approval.[4] At issue in this litigation is whether such preferential agreements subject to section 15 existed between the Ports Authority and PRMSA.

In Docket No. 76–38, the Commission found violations of section 15 in connection with three agreements between the Ports Authority and common carriers for the use of Isla Grande terminal.[5] Although only

2. In relevant part, section 15 provides that

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. . .

.  .  .  .  .

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation[.]

3. Section 1 of the Shipping Act, 46 U.S.C. § 801 (1976) defines these phrases:

The term "common carrier by water" means a common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port.

The term "other person subject to this chapter" means any person not included in the term "common carrier by water," carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.

The term "person" includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, or of any foreign country.

4. E. g., In the Matter of Agreement No. T–2138, 12 F.M.C. 126, 127 (1968); In the Matter of Agreement No. T–1870, 11 F.M.C. 12 (1967).

5. The Commission found section 15 violations committed through the failure to file and secure Commission approval of the 1972 preferential berthing agreement and marshalling area

the Commission's findings as to the arrangement between the Ports Authority and PRMSA are the subjects of appeal in this litigation, an understanding of this arrangement requires a brief explanation of the earlier agreements.

When PRMSA entered the Puerto Rico carrier trade in 1974 Seatrain had been docking at Isla Grande for some .12 years. In 1962 and again in 1968, the Ports Authority and Seatrain had entered into agreements found not to be subject to section 15. In 1972, however, Seatrain entered into another agreement for preferential berthing rights and exclusive use of the marshalling area at Isla Grande.[6] The implementation of that agreement, neither filed with nor approved by the Commission, was held in No. 76–38 to violate section 15. In conjunction with PRMSA's purchase of Seatrain's assets in 1974, Seatrain and the Ports Authority executed but did not file a lease termination agreement, also found by the Commission to have violated section 15.

As PRMSA entered the container trade, it advised the Ports Authority of its willingness to enter into contracts assuming Seatrain's obligations under the 1972 agreement. Nonetheless, in October 1974 PRMSA initiated its container operations at Isla Grande without having executed contracts with the Ports Authority. Only in October 1975 was an agreement drafted, and the parties did not execute that agreement until May 1976, when they filed it with the Commission. The agreement, T–3308, granted PRMSA preferential use of the berth and wharf, and exclusive use of the marshalling area at Isla Grande, in exchange for specified annual fees in addition to the usual dockage and wharfage tariffs. Seatrain protested the agreement, and the Commission held it for 10 months without taking action. In March 1979, Agreement T–3308 was withdrawn, and two superseding agreements, T–3453 and T–3453A, were filed.

In FMC Docket No. 76–38, the Commission concluded that the Ports Authority and PRMSA had committed two separate violations of section 15. One involved the marshalling or backup area, and stemmed from an oral agreement giving PRMSA exclusive use of the area. The other involved the berthing area, and resulted, not from agreement T–3308, but from an unfiled, unapproved agreement that the Commission inferred from the evidence in this docket and in Docket No. 76–41. Because we find neither conclusion supported by substantial evidence,[7] we reverse the Commission's findings of section 15 violations.

## · The Marshalling Area

The parties conceded that PRMSA was using the backup area at Isla Grande pursuant to an oral agreement, neither submitted to nor approved by the Commission, with the Ports Authority, pending execution of a written lease. Thus, the existence of a section 15 violation turns on whether that oral lease of backup land was subject to approval by the Commission.

According to Commission precedent, a landlord-tenant agreement between a ports authority and a carrier for use of a marshalling area is subject to section 15 approval only when the area is "essential" to use of the berth.[8] The Commission's finding

lease between the Ports Authority and Seatrain; the 1974 lease termination agreement between the Ports Authority and Seatrain; and the arrangements between the Ports Authority and PRMSA since 1974.

6. This agreement contained a secondary use requirement for the cranes then owned by Seatrain. The lack of such a requirement in the successor agreement with PRMSA is the subject of Docket No. 76–41.

7. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Administrative Procedure Act, 5 U.S.C. §§ 556(d), 706(2)(E) (1976).

8. *See* Agreement No. T–4: Terminal Lease Agreement at Long Beach, California, 8 F.M.C. 521, 528 (1965), a section 15 case in which the Commission considered a terminal lease and a truck terminal lease as a composite because both areas were essential to the carrier's container operations. The Commission interpreted the meaning of the T–4 decision in its decision in Docket No. 76–38, J. A. at 15, n.12: "[W]e have clearly held in the past that where marshalling areas are in the locale of the berth and

that the marshalling area at Isla Grande is essential is therefore critical to its decision and must be supported by substantial evidence in the record. No such substantial evidence exists in Docket No. 76–38. Indeed, the record suggests the opposite conclusion: Seatrain's own statements imply that the marshalling area is not essential for effective use of the berths at Isla Grande. Seatrain's initial written request to gain access to Isla Grande specified its need for a marshalling area of approximately 5 acres, which could be separated from the Isla Grande terminal.[9] Moreover, in an affidavit contravening the suggestion that Seatrain's use of the Isla Grande would cause congestion at the terminal, a Seatrain vice president stated that Seatrain could discharge its vessels at Isla Grande and move the container to its marshalling area at the nearby Pan American Dock.[10]

■ In the absence of substantial evidence as to the essentiality of the marshalling area to the use of Isla Grande,[11] the Commission's finding that the oral lease was subject to section 15 approval must fail. Accordingly, the Commission's decision that the Ports Authority and PRMSA violated section 15 by failing to secure approval of the oral lease is reversed.

are *essential* to the operation of the berth, an agreement relating to the lease of the adjacent backup area is subject to section 15."

9. Seatrain Reply Memo in Docket No. 76–38 before the Federal Maritime Commission, Ex. 1, J. A., at 133.

10. Affidavit of James Madden, 24 August 1976, J. A., at 131.

11. Nor does substantial evidence of essentiality exist in Docket No. 76–41. In that proceeding, Seatrain testified that it could operate adequately with marshalling space near Isla Grande (*e. g.*, at Pan American Dock), with reasonable ingress and egress to that marshalling area from Isla Grande. Testimony of David R. Segarra, Seatrain Vice President for Puerto Rico, J. A., at 1125. In the No. 76–41 proceeding, PRMSA testified that a marshalling yard as far away as 2 miles would not hamper operations, although marshalling space adjacent to the berth would be preferable. Testimony of Ronald M. Katims, Executive Vice-President, Puerto Rico Marine Management, Inc. (PRMSA's agent), J. A., at 1064–66.

### The Berthing Area

The Commission found that "the evidence establishes the existence of an unfiled, unapproved agreement relating to PRMSA's use of the berthing area at Isla Grande." J. A., at 18. To support this conclusion, the Commission noted that no other carrier has used Isla Grande since PRMSA began operations there,[12] and cited the presence of PRMSA's assets at the terminal. The Commission also asserted that Isla Grande is virtually useless as a container terminal without PRMSA's cranes, which PRMSA will not share; therefore the terminal is not available to other carriers on any basis. As additional factors in its decision, the Commission cited the Ports Authority's consent to a possible assignment by Seatrain of its rights, covenants, and obligations (presumably, but not explicitly, including Seatrain's secondary crane use provision) to PRMSA, J. A., at 66; a letter from Teodoro Moscoso, Chairman of PRMSA, expressing PRMSA's willingness to assume the obligations established in Seatrain's then-terminated lease, J. A., at 1198; the effective date (1 October 1975) contained in agreement No. T–3308;[13] and the unity of PRMSA and the Ports Authority insofar as Isla Grande is concerned.[14]

12. This statement is not strictly true. Subsequent to the Seatrain's sale of assets to PRMSA, Seatrain called to pick up cargo tendered to but not accepted by PRMSA, and made 19 calls pursuant to a PRMSA—Seatrain transshipment operation. J. A., at 547.

13. J. A., at 1214, 1223. Because PRMSA and the Ports Authority did not reach final agreement on the terms of T–3308 until 1976, the validity of the October date is subject to question. J. A., at 86.

14. J. A., at 19. For this assertion the Commission cited its determination, in Docket No. 76–41, that the Ports Authority and PRMSA are "one person" insofar as Isla Grande is concerned. Leaving aside the correctness of relying on determinations made in No. 76–41 to support a conclusion in No. 76–38, it is not altogether clear that the Commission's conclusion is supported by the evidence. The issue of the interrelatedness of the Ports Authority and PRMSA was set for investigation in Docket No. 76 41. The Initial Decision of Administrative

The unfiled agreement established by this evidence, the Commission concluded, constituted a violation of section 15.[15]

■ The evidence adduced in Docket No. 76–38 is insufficient to support the Commission's finding of an unfiled agreement between the Ports Authority and PRMSA. Rather, uncontroverted evidence shows that PRMSA paid only the standard wharfage and dockage charges prescribed by the Ports Authority tariff, and did not pay any preferential berthing fee.[16] Moreover, the critical finding that Isla Grande is unavailable for use by other container carriers without PRMSA's cranes is not supported by substantial evidence in the record. Indeed, the question of Isla Grande's availability to

other carriers without PRMSA's cranes was not posed in this proceeding, and no evidence directly on that issue was adduced.[17] Thus, the only other source for evidence is Docket No. 76–41, of which the Commission took official notice.

Even if No. 76–41 provided substantial evidence as to the necessity of PRMSA's cranes for the use of Isla Grande,[18] the Commission's official notice of that proceeding was improper. The Commission's Rule 226 permits official notice of "such matters as might be judicially noticed by the courts, or of technical or scientific facts within the general knowledge of the Commission as an expert body."[19] The issue of Isla Grande's

Law Judge Levy, J. A., at 541, adopted by the Commission, adverts to the "community of interest" shared by the Chairman of the Ports Authority and PRMSA, in concluding that the two agencies were "one person." Levy relied in part on PRMSA's chairman Moscoso's membership in the Ports Authority's Board of Directors. Moscoso was not, however, a member of that Board at the times involved in the litigation. See J. A., at 1135. Judge Levy does not connect his finding of unity with his conclusions of law, nor does the Commission decision in No. 76–41 refer to that finding of unity.

15. Even if the evidence were insufficient to find an unfiled agreement violated section 15, the Commission decision continued, the Ports Authority and PRMSA would still have violated section 15. For this conclusion, the Commission relied on PRMSA's admission, in its response to the FMC Order initiating No. 76–38, that portions of Agreement T–3308, those provisions relating to the backup area, had been implemented. PRMSA stated that "[t]he portions of the agreement that have been implemented do not require Commission approval[.]" J. A., at 73. The Commission asserts, however, that other provisions in T–3308, those relating to preferential berthing rights, are subject to section 15 approval. Commission precedent establishes that once a particular part of an agreement is subject to section 15, the entire agreement must be filed and approved before the agreement can be implemented lawfully. In the Matter of Agreement No. T–2455/T–2553, 18 F.M.C. 115, 129 (1974). The Commission therefore concluded that the failure to file Agreement No. T–3308 before implementation violated section 15.

Although the Commission correctly stated its precedent as to the necessity of filing the entire agreement if any part of it is subject to section 15, its conclusion seems inconsistent with the rationale it used to find a section 15 violation

from the exclusive use of the backup area. The Commission found that the Ports Authority and PRMSA had violated section 15 through an *oral* lease, pending execution of a written agreement. The Commission did not find the violation from the implementation of the portion of Agreement No. T–3308 that, it now asserts, required the agreement to be filed.

16. J. A., 49, 85. The FMC interpretation of the Shipping Act states that agreements covering the lease of marine terminal facilities are not subject to section 15 when they concern "terminal services, the charges for which appear in a tariff and are available to all applicants on equal terms." 46 C.F.R. § 530.5(d)(6) (1979).

17. The issue was raised, at least tangentially, when the Commission reopened the record, upon the Hearing Counsel's petition, to receive evidence as to the unfiled agreement. The Commission examined the evidence, found it unnecessary to the decision, and therefore did not rely on that evidence to any extent.

That evidence focused on the negotiations with CAROL Lines for the use of Isla Grande. The parties disagree as to whether the evidence proved that the Ports Authority excluded CAROL Lines, or offered the Isla Grande berths to CAROL. Even this additional evidence, however, related to the ability only of CAROL's vessels to use Isla Grande, and not to the ability of other carriers' vessels to use the berths.

18. That evidence is insubstantial, even in Docket No. 76–41. See Part III *infra*.

19. 46 C.F.R. § 502.226(a) (1979). A proviso requires that if a decision rests on notice of a material fact not appearing in the evidence of the record, the fact of notice is to be stated in the decision, and any party, on timely request, is to have the opportunity to prove the fact.

usefulness without PRMSA's cranes, rooted in factual determinations focusing on the structure of the wharf, requires direct evidence, and is not a technical or scientific fact within the Commission's general knowledge. Although in some instances, as the Commission asserts, it may be permissible to take official notice of evidence from one proceeding in another,[20] that practice is impermissible when it is prejudicial and the parties have no opportunity to challenge the facts. In a case in which an agency faced with two related proceedings looked to evidence from both in forming its judgment, the Supreme Court stated:

> if [that practice] has resulted in substantial prejudice . . . as might occur, for example, if the Commission were shown prejudicially to have considered evidence bearing on one case which did not affect it and was presented in the other, and which appellees were given no opportunity to meet, the orders, or one of them, would be improperly grounded.

*United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 528, 66 S.Ct. 687, 694, 90 L.Ed. 821 (1946). One of the issues posed in Docket No. 76–41 was whether Isla Grande is adequate for Seatrain's container service (using a vessel with no shipboard cranes) without the use of PRMSA's cranes, J. A., at 548, not whether that facility can be used practicably by *any* container vessels only with PRMSA's cranes. The parties did not address the broader issue directly, nor did the Ports Authority and PRMSA have the opportunity to meet evidence on that issue. The Commission's use of evidence on the issue of the essentiality of the cranes, insofar as that evidence existed, from Docket No. 76–41 in Docket No. 76–38 is therefore improper.

Moreover, evidence introduced in No. 76–38 after the proceeding was reopened, but not considered or relied on in the FMC decision, contravenes the Commission's conclusion that PRMSA was using Isla Grande

pursuant to an unfiled section 15 agreement. Evidence entered in the reopened proceeding was directed towards whether the Ports Authority had excluded another carrier, CAROL Lines, from Isla Grande or had offered the facility to CAROL. That evidence, although not without contradiction,[21] tends to show that the Ports Authority offered Isla Grande to CAROL Lines on a first-come, first-served basis,[22] and weighs against the Commission's finding of a preference toward PRMSA.

After examining the evidence in the reopened proceeding and finding it unnecessary to a decision on issues raised in No. 76–38, the Commission stated it did not rely on that evidence and denied the request of the Ports Authority and PRMSA for an evidentiary hearing on the evidence. J. A., at 21. Having reopened the hearing to admit new evidence, however, the Commission cannot ignore the evidence admitted. The requirement of a hearing "implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action." *The Chicago Junction Case,* 264 U.S. 258, 265, 44 S.Ct. 317, 320, 68 L.Ed. 667 (1924).[23]

We conclude that the Commission's finding of an unfiled, unapproved agreement between the Ports Authority and PRMSA regarding the use of the berthing area at Isla Grande is not supported by substantial evidence in the record. Accordingly, we reverse.

### III

Section 16 First of the Shipping Act, 46 U.S.C. § 815 (1976), makes it unlawful for any "common carrier by water, or other person subject to this chapter" to confer any undue or unreasonable preference or to impose any undue or unreasonable prejudice or disadvantage on any person, locality,

---

**20.** FMC Decision in Docket No. 76–38, J. A., at 17 n.14 and decisions cited therein.

**21.** *See,* Affidavit of R. A. Cuprill, FMC District Director for Puerto Rico, J. A., at 155–57.

**22.** *See, e. g.,* J. A., at 181, 192, 222, 266–67, 269-70.

**23.** *See also S. D. Warren Co. v. NLRB,* 342 F.2d 814, 816 (1st Cir. 1965).

or description of traffic.[24] In Docket No. 76–41, the Commission, adopting with clarifications the Initial Decision of the Administrative Law Judge,[25] found that both the Ports Authority and PRMSA had violated section 16 First. The Ports Authority violated section 16 First by failing to ensure that the public facilities at Isla Grande did not become dedicated to private exclusive use. J. A., at 287. PRMSA's violation was to grant unreasonable preference to itself, by exclusive use of the public area at Isla Grande and by exclusive use of its own cranes situated on that property. J. A. at 284.

### The Ports Authority

The Commission asserts, and the Ports Authority agrees, that Isla Grande is a public terminal for which no section 15 preferential use agreement has been approved.[26] Despite the public character of the terminal, however, the Authority will not assign to Isla Grande a vessel that cannot feasibly work there. And, the Commission continued, a vessel cannot feasibly be worked without the use of PRMSA's shoreside cranes, which PRMSA refuses to share. The Ports Authority's acquiescence in this refusal, in denigration of its authority to require secondary crane use, has the effect of granting to PRMSA both an unreasonable preference and control of berthing at Isla Grande. J. A., at 285–86.

Preliminarily, it must be noted that section 16 imposes no general requirement that a port operator provide terminal equipment to carriers. Moreover, the Commission decision in this proceeding indicates that the Port Authority has no generalized duty to require crane sharing at the Port of San Juan. The Commission decision noted that the crane-sharing requirement was intended to "right a wrong" at Isla Grande, and not "to apply indiscriminately to 'docks all over the country.' "[27] Thus, the peculiar configuration at Isla Grande and the Commission's conclusions as to its effect have led the Commission to its decision that to avoid a violation of section 16 First, the Ports Authority must require PRMSA to share its cranes at Isla Grande.

The conclusion that, due to its configuration, Isla Grande cannot be used without PRMSA's cranes is critical to the Commission's determination that PRMSA controls the terminal and therefore has been granted a preference. We find, however, that the evidence in No. 76–41 does not support that conclusion. One of the issues that the Commission had posed for the Administrative Law Judge was whether Isla Grande is adequate for Seatrain's container service without the use of PRMSA's container cranes. J. A., at 548. The Seatrain vessel, Transindia, has no shipboard container cranes and must rely on shore side or mobile cranes to work at Isla Grande. The configuration of the dock makes the use of mobile cranes impracticable, if not impossi-

---

24. In relevant part, section 16 First provides:
    It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—
    First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: . . .

25. J. A., at 509–86. The Commission had directed the administrative law judge to address 14 specific issues, in considering the alleged violations of sections 16 and 17 of the Shipping Act. These issues focused on the status of Isla Grande as a public facility and the availability

to Seatrain of adequate berthing facilities at the Port of San Juan.

26. *See* II *supra.*

27. J. A., at 291. The decision was served on October 4, 1978. Shortly thereafter, on October 31, 1978, the Commission approved preferential berthing agreements without crane-sharing provisions between the Ports Authority and PRMSA and Sea-Land Service for Puerto Nuevo. Originally, the Commission had approved those agreements only until 60 days after the decision in No. 76–41, presumably to allow implementation of any broad principle with regard to crane sharing at the Port of San Juan. The Commission then retreated from applying that principle to any berth except Isla Grande. *See* Ports Authority, Opening Brief, at 60.

ble. Without PRMSA's cranes, the Administrative Law Judge concluded, Seatrain's vessel cannot work at Isla Grande. J. A., at 548–50.

Without impugning the accuracy of the conclusion as to Seatrain's vessel, we note that the usability of Isla Grande without PRMSA's cranes by vessels—container or noncontainer—other than Seatrain's was not at issue in the proceeding, nor did the Administrative Law Judge reach a conclusion as to that broader issue. The Commission decision nevertheless states that "PRMSA acknowledges that a vessel berthing at Isla Grande cannot feasibly be worked without the use of shoreside cranes[.]" J. A., at 285. We find that this conclusion is not supported by substantial evidence. The Initial Decision cites only two pieces of evidence to support its finding that vessels with shipmounted gantries cannot use Isla Grande.[28] These do not provide substantial evidence that shipboard cranes cannot reach over the dip. Moreover, the presence of the cranes notwithstanding, evidence in No. 76–41 did not address and therefore did not resolve the issue whether Isla Grande can be used for breakbulk or roll on/roll off vessels.

Absent substantial evidence of the inability of other vessels to use Isla Grande without PRMSA's cranes, the Commission's conclusion that PRMSA controls Isla Grande cannot stand. It is our view that the cranes enhance, rather than control, Isla Grande. Indeed, as counsel for the Commission acknowledged at oral argument before this

Court, PRMSA is perfectly free to remove its cranes from the berths, an action that would return Isla Grande to its former status as a breakbulk terminal.

■ Assuming, *arguendo*, that the evidence had shown that Isla Grande cannot be used without PRMSA's cranes, we are not compelled to find that the Ports Authority's acquiescence in PRMSA's refusal to share the cranes constituted a section 16 First violation. That section prohibits preferences and discriminations that are "undue or unreasonable." [29] The situation existing at the Port of San Juan involved no undue or unreasonable preference or discrimination. On the contrary, the Ports Authority offered to treat all carriers, including Seatrain, fairly, within the ambit of its passive port development plan. Only four of the ten contiguous container berths at Puerto Nuevo had been in use prior to and during the Commission proceedings, J. A., at 517. Other berths were, and continue to be, available for Seatrain, on the same terms accorded to other carriers, to develop to suit its container trade; alternatively, Seatrain could call at an undeveloped berth and use mobile cranes to move its containers.

Commission precedent establishes that the exclusive assignment of public facilities to one carrier does not violate section 16 unless the challenged lease either fails to compensate the port adequately [30] or unreasonably forecloses other carriers from securing adequate facilities. Moreover, the

---

**28.** The first, an assertion in a letter referring to the vessels and cranes of CAROL Lines, stated that it was the view of PRMSA's management agent that "*these* vessels cannot be served at this berth with shipboard gantrys." J. A., at 1446 (emphasis added). The second is testimony with reference to whether self-unloading cranes on a vessel like Seatrain's could handle the weight of containers across the dip. The response of the Ports Authority's executive director was that he did not know. J. A., at 858.

At oral argument before the Commission, counsel for PRMSA acknowledged that the cranes do make Isla Grande a successful container terminal, but suggested that the terminal could be used for containers without the cranes, albeit impracticably and unprofitably. J. A., at 1111–12, 1114.

**29.** The Commission decision acknowledges that "not all exclusive or preferential terminal lease agreements are violative of section 16 First." J. A., at 286. *See, e. g.,* In the Matter of Agreement No. T–2598, 17 F.M.C. 286 (1974); In the Matter of Agreement No. T–1870, 11 F.M.C. 12 (1967); Agreement No. T–1768—Terminal Lease Agreement, 9 F.M.C. 202 (1966).

**30.** In the Matter of Agreement No. T–1870, 11 F.M.C. 12 (1967); *See* Agreement No. T–1768 —Terminal Lease Agreement, 9 F.M.C. 202 (1966); Agreement No. T–4: Terminal Lease Agreement at Long Beach, California, 8 F.M.C. 521 (1965).

Commission has expressly refused to find discrimination or preference in a situation in which the port indicated willingness to make similar, but not necessarily identical, arrangements available to other carriers.[31] At San Juan, the Ports Authority provides similar facilities to all carriers: berths, port dredging, properly constructed wharves, paved transit areas, and the opportunity to lease ready-to-pave backup areas. To satisfy requirements beyond these each carrier is free to lease and improve a berth and backup area, or to work a public facility, using mobile cranes. The Ports Authority suited its berthing assignments to each carrier's operations, with a simultaneous view to both the development of the total Port of San Juan and its own economic needs.[32] Its treatment of both PRMSA and Seatrain was consistent with these goals and does not constitute a violation of section 16 First.

### PRMSA

In finding that PRMSA has violated section 16 First, the Commission focused on PRMSA's exclusive use of the public areas at Isla Grande. It held that PRMSA's refusal to share its shoreside cranes, thereby depriving other carriers of the use of Isla Grande, resulted in PRMSA's granting to itself an undue and unreasonable preference over other carriers. J. A., at 287-88.

■ Because section 16 First prohibits the imposition of undue or unreasonable prejudice or disadvantage, a violation of that section normally involves a "triangular relationship" between the violator, the preferred party, and the party suffering discrimination. One carrier's preference for itself over another carrier lacks such a triangular relationship, and therefore does not usually constitute a section 16 violation.[33] The Commission's assessment of the situation at Isla Grande, however, led it to conclude that PRMSA's refusal to share its cranes was not merely a self-preference. Instead, the Commission found a duality in PRMSA's role at Isla Grande, and characterized PRMSA as both a terminal operator and a common carrier.[34] It then found that PRMSA as terminal operator was preferring PRMSA as common carrier.[35] Thus, PRMSA was violating section 16 First.

■ We find, however, that PRMSA does not function as a terminal operator at Isla Grande. Without this critical conclusion, the Commission's decision cannot stand. Although a carrier may at times function as a terminal operator,[36] PRMSA's activity at Isla Grande does not present such a situation. PRMSA used its cranes for a purpose incident to its role as common carrier. Its common law and statutory obligations to its shippers include discharging cargo and plac-

**31.** In the Matter of Agreement No. T–1870, 11 F.M.C. 12, 20 (1967).

**32.** See In the Matter of Agreement No. T–2598, 17 F.M.C. 286, 300 (1974).

**33.** Anglo Canadian Shipping Co. v. Mitsui Steamship Co., 4 F.M.B. 535 (1955).

**34.** In a footnote, the Commission said "Because we find PRMSA to be an 'other person' for the purposes of this proceeding, infra, it is unnecessary to address PRMSA's argument that the triangular relationship cannot be satisfied by a finding of self preference." J. A., at 287 n. 7.
In its discussion of section 17, the Commission found that PRMSA, through its control of berthing at Isla Grande, furnishes terminal facilities, in addition to its role as common carrier. See IV infra for a discussion of PRMSA's status as an "other person."

**35.** The Commission decision noted that when terminal services are involved, a competitive

relationship between the preferred and deferred parties is no longer necessary. J. A., at 287. See Violations of Sections 14 Fourth, 16 First and 17, Shipping Act, 1916, 15 F.M.C. 92, 98 (1972); Investigation of Free Time Practices—Port of San Diego, 9 F.M.C. 525, 547 (1966); See also New York Foreign Frgt. F. & B. Ass'n v. F.M.C., 337 F.2d 289, 299 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965). Nonetheless, these decisions do not abrogate the requirement of a triangular relationship. The Commission's emphasis notwithstanding, the question of competitiveness is not at issue here. No question exists that the preferred carrier, PRMSA, competes with the deferred Seatrain.

**36.** See Matson Navigation Co.—Container Freight Tariffs, 7 F.M.C. 480 (1963); Anglo Canadian Shipping Co. v. Mitsui Steamship Co., 4 F.M.B. 535, 542 (1955).

ing it on the dock.[37] Use of the cranes to fulfill these obligations does not invest PRMSA with terminal status.[38] Moreover, the evidence in this proceeding showed, and the Administrative Law Judge held, that PRMSA has never allowed other carriers to use its cranes at Isla Grande to serve their shippers.[39] Thus PRMSA has not furnished terminal services to other carriers.

Without a sustainable finding either that PRMSA's use of its own cranes for the benefit of its shippers constituted terminal operation or that it provided the cranes (and therefore terminal services) to other carriers, the Commission's conclusion that PRMSA acted as a terminal operator at Isla Grande must depend on its conclusion that the cranes there control the terminal. As we held with regard to the Ports Authority, the Commission's finding of control is not supported by substantial evidence.

Because PRMSA is not a terminal operator, its refusal to share the cranes at Isla Grande lacks the triangular relationship contemplated by section 16 First. The common carrier PRMSA has thus preferred only itself and has not violated section 16 First.

### IV

Section 17 of the Shipping Act, 46 U.S.C. § 816 (1976) prescribes in part that every "common carrier by water in foreign commerce" and every "other person subject to this chapter" shall "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property." The Initial Decision of the Administrative Law Judge, adopted by the Commission in Docket No. 76–41, held that both the Ports Authority and PRMSA had violated section 17. The Ports Authority's violation resulted from "its failure to establish and enforce just and reasonable regulations concerning assignment of berths and utilization of public areas at Isla Grande in connection with the delivery, handling and storage of property." PRMSA's violation resulted from its failure to establish appropriate regulations "concerning secondary utilization of its container cranes and rails located in the public area at Isla Grande." J. A., at 585. We hold that neither PRMSA nor the Ports Authority has violated section 17.

The relevant provisions of section 17 apply to every "common carrier by water in foreign commerce" and to every "other person subject to this chapter". Because PRMSA services only routes between the continental United States and Puerto Rico, it is not a common carrier in foreign commerce.[40] Therefore, if PRMSA is subject to section 17, it must be an "other person subject to this chapter," which is defined as "any person not included in the term 'common carrier by water,' carrying on the business of . . . furnishing . . . terminal facilities in connection with a common carrier by water." 46 U.S.C. § 801 (1976). Contrary to the Commission's finding, PRMSA cannot be an "other person subject to this chapter." PRMSA is clearly a "common carrier by water," a category specifically excluded from the definition of "other person." On this basis alone, PRMSA is beyond the purview of section 17. In addition, however, PRMSA is not subject to section 17 because it is not an "other person" by reason of furnishing terminal facilities. As we held with regard to

37. See e. g., American President Lines, Ltd. v. Federal Maritime Board, 317 F.2d 887, 888, 115 U.S.App.D.C. 187, 188 (1962). See also Ex parte Easton, 95 U.S. 68, 75, 24 L.Ed. 373 (1877); The Eddy, 72 U.S. (5 Wall.) 481, 18 L.Ed. 486 (1867).

38. Matson Navigation Co.—Container Freight Tariffs, 7 F.M.C. 480, 490–91 (1963).

39. J. A., at 546–48; J. A., at 289. The Administrative Law Judge mentioned PRMSA's negoti-

ations with CAROL Lines for the use of facilities, including the cranes, at Isla Grande. At the close of the administrative record, however, CAROL had not berthed at Isla Grande. J. A., at 548.

40. 46 U.S.C. § 801 (1976). Section 18, 46 U.S.C. § 817 (1976), with provisions analogous to section 17, but not at issue in this proceeding, would apply to PRMSA as a "common carrier by water."

section 16 First, PRMSA's use of its cranes in the context of service to its own shippers does not make it a terminal operator. PRMSA's refusal to permit secondary use of the cranes by other carriers also negates the conclusion that it provides terminal facilities.

We hold that PRMSA is not subject to section 17 of the Shipping Act. Therefore, we reverse the Commission's finding of violation as to PRMSA.

The Ports Authority, as a provider of terminal facilities, is clearly subject to section 17 as an "other person subject to this chapter." Its violation of section 17, the Commission found, stemmed from the failure to establish just and reasonable regulations for the use of Isla Grande terminal, including PRMSA's cranes. We disagree, particularly in light of our holding that neither the Ports Authority nor PRMSA has violated section 16 with regard to Isla Grande. On the contrary, it would seem that the Ports Authority's refusal to assign to Isla Grande a container carrier unable to work its vessel there is an indication of efficient port management.

In accordance with its responsibility to operate the Port of San Juan for the public good, the Ports Authority must allocate berth assignments to promote full port development and utilization. As we noted above, in early years, when adequate facilities were limited, efficient port management, in the Ports Authority's judgment, required crane sharing. Now, with a number of berths at Puerto Nuevo remaining under-developed and unprofitable despite huge investments, that sharing is no longer necessary. Indeed, by minimizing the carrier's incentive to improve a berth suitable for its own operations, the continued requirement of crane sharing may inhibit the development of the Port of San Juan. In tailoring its berth assignments to the needs of the port as a whole, the Ports Authority has initiated a program consistent with the Commission's own requirements: "As used in section 17 and as applied to terminal practices, we think that 'just and reasona-

ble practice' most appropriately means a practice . . . which is fit and appropriate to the end in view." [41] In light of the Ports Authority's responsibility for the development of the entire port, including the underused Puerto Nuevo area, we hold that the decision not to exact a crane-sharing agreement from PRMSA at Isla Grande is reasonable and does not violate section 17.

The statutory violations found by the Commission in these proceedings are hereby set aside.

*It is so ordered.*

LUMBARD, Circuit Judge, dissenting:

I dissent.

This controversy is, in essence, a struggle for access to high-speed shore-mounted cranes located on the docks at Isla Grande, part of San Juan harbor, Puerto Rico. Intervenor Seatrain has sought, since 1975, "secondary use" of the cranes—that is, permission to use the cranes, at a fee, when such use would not interfere with the schedules of the owner of the cranes, Puerto Rico Maritime Shipping Authority ("PRMSA"). PRMSA refused such use, and the Puerto Rico Ports Authority ("PRPA") therefore declined to assign Seatrain any berthing privileges at Isla Grande, on the ground that Seatrain's vessels, which are containerized, cannot practicably be worked at Isla Grande without aid from the cranes. After hearings before an administrative law judge, the Federal Maritime Commission ("FMC") found that PRMSA and PRPA, lessee and lessor respectively of the Isla Grande facilities, had effected unfiled agreements which were required to be filed, thus violating § 15 of the Shipping Act of 1916, 46 U.S.C. § 814. F.M.C. Docket No. 76–38. In a related proceeding, the Commission found that PRPA had given PRMSA an "unreasonable preference" by allowing PRMSA to exclude other carriers from Isla Grande by denying them access to the cranes, and that PRMSA in its capacity as terminal operator had shown "unreasonable preference" to PRMSA in its capacity

41. *Investigation of Free Time Practices—Port of San Diego,* 9 F.M.C. 525, 547 (1966).

as carrier; both PRPA and PRMSA were found to have violated § 16 of the Shipping Act of 1916, 46 U.S.C. § 815. F.M.C. Docket 76–41. Additionally, in the same proceeding, the FMC found that berthing arrangements at Isla Grande reflected a failure by PRPA and PRMSA to regulate loading and unloading operations there in a "just and reasonable" manner, thus violating § 17 of the Shipping Act, 46 U.S.C. § 816. The Commission ordered that PRMSA make its cranes available to Seatrain and that PRPA assign berthing space to Seatrain at Isla Grande.[1]

Today the majority holds that there was insufficient evidence to support the FMC's findings as to any of the violations by either of the parties. I dissent because on the record before us there is sufficient evidence to support the Commission's findings with respect to each alleged violation of the Shipping Act, and because the relief ordered by the Commission was lawful and appropriate.

The PRPA is an instrumentality of the Commonwealth of Puerto Rico, created in 1942, which since the early 1950's has developed the island's ports on a "passive" plan. PRPA performs initial dredging, channel and harbor work, and stands ready to lease berths, adjacent wharves and back-up land on a long-term basis. But the lessee carriers are left to bear the cost of major improvements to the berthing areas—paving, road-building, fencing, lighting, and erection of storage facilities.

PRMSA, also an instrumentality of the Commonwealth, was formed by action of the legislature in 1974 as a publicly owned carrier. In 1974, PRMSA purchased all the Puerto Rican assets of all the carriers then serving the mainland-Puerto Rico trade.

One of the carriers bought out by PRMSA in 1974 was intervenor Seatrain. Seatrain had been leasing the berths at issue at Isla Grande since 1962. Seatrain's pre-1974 leases with PRPA required Seatrain to grant secondary use privileges for its high-speed cranes—which it had bought and installed under the "passive port" poli-

cy—to other carriers. Title to these cranes was transferred to PRMSA in 1974 along with Seatrain's other Puerto Rican assets.

In 1975, Seatrain decided to re-enter the mainland-Puerto Rico trade, and asked PRMSA to make available the Isla Grande cranes on a secondary use basis. PRMSA refused. Seatrain then asked PRPA to insist that PRMSA provide such secondary use. PRPA refused. Seatrain filed a complaint with the FMC, which conducted a preliminary investigation. Several FMC officials visited Puerto Rico in an attempt to negotiate an end to the dispute without resort to litigation. PRPA remained firm, offering Seatrain only a lease for certain unimproved berthing areas at Puerto Nuevo, another berthing area that is part of San Juan harbor. In order to use the Puerto Nuevo berths to unload its containerized cargo, Seatrain would have had to buy and install high-speed cranes similar to those at Isla Grande. In view of the relatively small scale of Seatrain's Puerto Rican operations—Seatrain vessels call at a Puerto Rican port about once every two weeks—Seatrain considered such an investment economically unwise.

### The Section 15 Violation

Section 15 of the Shipping Act of 1916 reads in pertinent part:

> Every common carrier by water . . . shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter . . . to which it may be a party . . . giving or receiving special rates, accommodations or other special privileges or advantages . . . allotting ports . . . or in any manner providing for an exclusive, preferential or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

46 U.S.C. § 814 (1976).

In Docket No. 76–38, the FMC found that Seatrain and PRPA had violated this sec-

---

1. Seatrain has also filed a suit seeking $5 million in damages from PRPA and PRMSA based

on the practices described by the FMC in its decisions.

tion from 1972 to 1974; and that PRPA and PRMSA had been in violation from 1974 to the time of decision. Only the latter finding is at issue in this appeal.

The FMC's finding is based on the theory that, by restricting access to the high-speed cranes, PRPA and PRMSA forged an arrangement giving PRMSA de facto exclusive access to the docks in question at Isla Grande. There is no question but that such an agreement, if it existed, was required to be filed. There is no question but that PRPA and PRMSA are subject to section 15. The only issue for the court is the sufficiency of the evidence underlying the FMC's theory that the actions of PRPA and PRMSA constituted a preferential berthing agreement.

In part the Commission's conclusion rests on its empirical observation that no other carrier has made significant use of the Isla Grande berths since PRMSA took them over; and partly on the Commission's conclusion that the docks, because of the way they were built, could not be used for the unloading of containerized cargo without shore-mounted cranes. In addition, the FMC relied on the fact that in May, 1976, PRPA and PRMSA filed with the FMC a draft agreement, numbered T–3308, which was withdrawn by the parties before the FMC took any action on it; and on the fact, as found by the administrative law judge, that the overlap of personnel and interests of the two entities justified treating PRPA and PRMSA as a single unit for some regulatory purposes. Since the majority, with respect to Docket Number 76–38, confined itself to saying that "it is not altogether clear that the Commission's conclusion is supported by the evidence," Maj.Op. at

478 n. 14, I take it that this court has not upset the FMC's finding on this point.[2]

The majority reasons that, because PRMSA paid PRPA no money that can be identified as an extra charge for the alleged preferential rights, and because there is insufficient evidence to support the critical finding that Isla Grande is unusable by carriers without access to the cranes, the FMC's finding of a section 15 violation must fail. It seems to me that there is nothing in the language or logic of the statute that requires that preferential berthing rights be charged for or paid for in order to trigger the filing requirement. The statute is concerned with ensuring public scrutiny of preferences, and the fact that a preference is free only reinforces the probability that it is anti-competitive or the result of collusion.

The majority points out that the Commission, in finding a section 15 violation in Docket No. 76–38, took official notice of its findings in Docket No. 76–41 that the cranes were indispensable to operations at Isla Grande. The majority characterizes the configuration of the Isla Grande docks as not a "technical or scientific fact" and I do not disagree. The official notice provision relied upon by the Commission is rather that portion of the FMC's Rule 226, 46 C.F.R. 502.226, that allows official notice to be taken of "such matters as might be judicially noticed by the courts." In *United States v. Pierce Auto Lines*, 327 U.S. 515, 528, 66 S.Ct. 687, 694, 90 L.Ed. 821 (1945), relied upon by the majority, the Court upheld an order of the Interstate Commerce Commission in which the ICC had used evidence developed in one case in deciding another, related case. The Court pointed

---

**2.** The FMC's finding that PRPA and PRMSA are identical for some regulatory purposes because of overlap of personnel and interests is relevant not only to the issue of whether or not an unfiled agreement was carried out, but supports the Commission's conclusion that any preference granted PRMSA by PRPA was "unreasonable", and supports the Commission's conclusion that PRPA failed to order PRMSA to establish "just and reasonable" regulations. Moreover, it undermines the majority's view that the reason PRPA allowed PRMSA to

refuse secondary use was PRPA's desire to foster further development at Puerto Nuevo; given the identity of interest between the two instrumentalities of the Commonwealth, it would be just as reasonable to think that PRPA's purpose may have been simply to ensure that PRMSA maintained its effective monopoly on the mainland-Puerto Rico containerized trade, despite Seatrain's attempt to re-enter that trade and re-establish a competitive structure in the industry.

out that the parties and issues in the two proceedings were nearly identical, and that unless prejudice could be shown the orders were valid. Examples of such prejudice are restrictions on cross-examination or use by the Commission of "evidence bearing on one case which did not affect it and was presented in the other, and which appellees were given no opportunity to meet," 327 U.S. at 528, 66 S.Ct. at 694. The Court reasoned that "large portions of the evidence applied as much to one application as to another. This was true, for example, of the proofs relating to traffic conditions, shipper demands, the need for faster service and mechanical refrigeration, and other items. In these circumstances it is difficult to see how appellees could have sustained substantial prejudice from the Commission's consideration of the evidence upon matters as closely related as those in issue in these two proceedings." *Id.* The FMC's official notice in this case resembles the ICC's in *Pierce* closely enough to be included within *Pierce's* holding.

The majority argues that the question posed by the administrative law judge in Docket No. 76–41 was whether Seatrain's vessels could practicably use the Isla Grande docks without the cranes, and not whether *any* carrier's vessels could so use them. Thus, the majority concludes, the parties did not have the opportunity in Docket No. 76–41 to present evidence on the issue, making official notice in Docket No. 76–38 improper. In short, in the majority's view the fact purportedly noticed in Docket No. 76–38 had not been found in Docket No. 76–41 at all.

The fatal flaw in the majority's reasoning is that the statute does not require a finding by the Commission that the unfiled agreement between PRPA and PRMSA gave PRMSA *exclusive* berthing rights at Isla Grande. All it requires is that PRPA gave PRMSA *preferential* berthing rights. Thus, even if only Seatrain's ships were prevented from using Isla Grande, the Commission's findings would be legally sufficient to support a finding of violation of section 15. The majority does not dispute the fact that in Docket No. 76–41 it was

established that Seatrain's vessels could not practicably use Isla Grande without access to the shoreside cranes. Since this finding was tested in the crucible of adversary proceedings between the parties, the Commission was justified in noticing it in a related proceeding, and it is enough to support the Commission's legal conclusion.

The majority's reliance on the evidence regarding the ability of CAROL line ships to use Isla Grande is misplaced. Such evidence was indeed, as the majority concedes, "not without contradiction", and we cannot reverse the FMC's interpretation of the evidence without falling afoul of the rule that an administrative agency's determination can withstand appellate review if supported by "substantial evidence." Since there was evidence in the record that CAROL was told by PRMSA that its ships could not use Isla Grande because of the structural configuration of the berths, the majority's attempt to argue that the CAROL negotiations prove that PRMSA was willing to make Isla Grande available to other carriers is unpersuasive.

The FMC also relied on a basis independent of the indispensability of the cranes in finding a violation of section 15. It found that PRPA and PRMSA had engaged in unfiled agreements with regard to back-up marshalling areas. As the majority points out, the legal issue is whether or not the marshalling area in question is "essential" to use of the berths, because the FMC's precedents hold that agreements for the use of marshalling areas are subject to section 15's filing requirements only if the area is "essential." *Agreement No. T–4—Terminal Lease Agreement at Long Beach, California*, 8 F.M.C. 521 (1965). The majority concludes that there is insufficient evidence in the record to support the FMC's decision that this area is essential. I disagree.

It is true that Seatrain and PRMSA have said, both in communications prior to this litigation and in testimony, that in their view the marshalling area is not essential. But, in my view, Seatrain's willingness to attempt to make do without the marshall-

ing area does not bind the FMC, which is still free to conclude that the area is "essential" within the meaning of the FMC's own case law. Nor is it clear what additional evidence the Commission needs to have in the record beyond its recital of the location of the marshalling area and its proximity to the berths in question. On such facts, whether or not the marshalling area is essential must remain a judgment for the Commission with its maritime expertise to make, and I can see no easy way for a court to say that any marshalling area that is the most convenient to a berth is not also "essential" if the Commission so finds on what must be the unique facts of each case. It may be that the FMC would be expanding the reach of its case law in so finding. But there is nothing in the common law of administrative agencies or in the Shipping Act to prevent the FMC from adopting a broader definition of what is an "essential" marshalling area in 1980 than at the time of its first decisions in this area.

Finally, there is a second independent ground on which the FMC's finding of section 15 violations should be sustained. Agreement T–3308 is, on its face, an agreement that required filing, since it contained explicit berthing preferences. PRMSA and PRPA admitted implementing parts of T–3308 that, they thought, did not need Commission approval, during the period when the application was pending. But FMC case law is clear that no part of an agreement required to be filed as a whole—including parts which, if independent, would not be subject to filing—may be implemented before approval of the whole. *In the Matter of Agreement No. T–2455/2453*, 18 F.M.C. 115 (1974).

*Section 16 Violations*

The FMC concluded that PRPA and PRMSA had violated section 16 by virtue of the "unreasonable preference" shown by PRPA to PRMSA in granting exclusive use of the Isla Grande berths, and that PRMSA had shown an unreasonable preference to itself.

Section 16 reads in relevant part:

It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person . . . or to subject any particular person—to any undue or unreasonable prejudice . . . . .

46 U.S.C. § 815 (1976).

As the majority points out, typically a violation of section 16 involves a "triangular" relationship. A reviewing court can identify a violator (usually a terminal operator), a preferred party (one carrier) and a deferred party (another carrier). In finding that PRMSA violated section 16, the FMC reasoned that PRMSA functioned both as a terminal operator and as a carrier, and that in one role it had preferred itself in the other, to Seatrain's detriment. The Commission's case law has long recognized the possibility that a "preference of a carrier for itself in other capacities [for example, as a terminal operator] involves preferring, preferred and deferred parties." *Anglo-Canadian Shipping Co., Ltd. v. Mitsui Shipping Co.*, 4 F.M.B. 535, 542 (F.M.B.1955). *See also McCabe, Hamilton & Renny Co., Ltd. v. C. Brewer Corp.*, 12 S.R.R. 877 (1972), F.M.C. Docket No. 70–14. Such a view is necessary to avoid the circumvention of section 16 by the purchase, by a terminal operator, of a carrier.

But the majority concludes that PRMSA has not functioned as a terminal operator because, first, it has not let other carriers use its terminal facilities; second, its own use of its terminal facilities does not make it a terminal operator; and, third, its control of the cranes does not constitute de facto control of the terminal. With the first and third of these conclusions I disagree. The question is not whether there has been actual use of PRMSA's facilities by other carriers.

It is sufficient that PRMSA has held itself out as a terminal operator by offering such use, on any basis. Such an offer appears in the record, J.A. at 548. The Com-

mission's view of PRMSA as a terminal operator by virtue of its de facto control over the terminal by virtue of its control of the cranes rests on the central finding in this proceeding, the indispensability of the cranes, and to this issue—on whose resolution the outcome of the findings of section 16 violations by both PRPA and PRMSA depends—I now turn.

Some basic facts about the Isla Grande facilities are not in dispute. The facilities are a public terminal. No valid preferential berthing agreement is in force covering them. Yet the PRPA, which has sole authority, acknowledges that it will not allow vessels to berth at Isla Grande unless they can feasibly be unloaded there. Furthermore, the Commission found, no containerized ships can feasibly be unloaded at Isla Grande without the help of the high-speed shore-side cranes. PRMSA exercises control over these cranes, and has refused to allow another carrier access to them. The PRPA has refused to order PRMSA to make the cranes available. In the Commission's view, the result was that PRMSA exercised a de facto monopoly over the privilege of berthing at Isla Grande.

The issue reduces itself to whether or not the FMC record includes substantial evidence that there are no ships which could use Isla Grande without access to the shore-side cranes. The issue framed for the administrative law judge was whether or not Seatrain's vessels, which are containerized and have no ship-mounted cranes, could use Isla Grande without the shore-mounted cranes. The majority does not question the sustainability of the FMC's adoption of his finding that they could not. But the majority points out that the administrative law judge did not make findings that would cover the feasibility of non-containerized ships, or vessels with ship-mounted cranes, using Isla Grande without the aid of PRMSA's cranes.

Like the majority, I lament the paucity of evidence in the record on this crucial point. But I do not believe that the majority's speculation that there exist ships which could use Isla Grande without the shore-

side cranes is a better basis for deciding this case than the admittedly thin record. It is clear from the record that Seatrain had no vessels which could use Isla Grande without access to the PRMSA cranes. The record also shows that when another carrier in the Puerto Rico-mainland trade wrote to PRMSA regarding use of the Isla Grande berths, it was told in writing that its vessels "cannot be served at this berth with shipboard gantrys." Since the same letter admits that PRMSA was unaware of the structural characteristics of the vessels at issue, the letter can be read to mean that in PRMSA's view no ship-mounted cranes could do the job. The administrative law judge found that the use of mobile shore-side cranes was impracticable because of the "bitts" and "dips" which indent the side of the berths. Thus in my view there was sufficient evidence for the FMC to conclude that no containerized vessels could use Isla Grande practicably without access to the shore-side rail-mounted cranes. It is certainly clear that PRMSA acted as if such use was impracticable, and the record is clear that insofar as any of the ships actually engaged in the Puerto Rico-mainland trade were concerned, such use was impracticable. The fact that ships never yet engaged in the Puerto Rico trade may exist elsewhere, or indeed may be developed in future, which can use Isla Grande without the shore-side cranes, and that the FMC did not investigate these possibilities, seems an insufficient reason for upsetting an administrative determination that is adequately based on the relevant facts as reflected in the record.

For similar reasons I am unconvinced by the majority's argument that possible use of the Isla Grande facility by non-containerized vessels means that the FMC's conclusion that the cranes are functionally indispensable is without basis. Isla Grande was converted into a containerized terminal in 1962. This proceeding involved carriers engaged in a containerized trade. The fact that it may be legally permissible for PRMSA to dismantle the crane rails and use Isla Grande as a breakbulk terminal is no more relevant than the possibility that

five-masted sailing ships may be able to use Isla Grande without aid from the cranes. The FMC's conclusion that the cranes are "indispensable" to feasible use of Isla Grande must be understood to mean economically as well as structurally, and the Commission was not acting beyond its authority in confining its conclusions to those facts closest to reality.

The majority also argues that, assuming arguendo that the Commission's finding on indispensability is upheld, the resulting preference was not "undue or unreasonable." The majority admits that a preferential berthing arrangement constitutes an "unreasonable" preference if other carriers are thereby foreclosed from securing adequate facilities. Yet the majority chooses to ignore the finding by the Commission that none of the alternate facilities offered to Seatrain by PRPA was adequate. J.A. at 542. So long as this finding remains undisturbed, it is hard to see how the Commission's resulting conclusion that the preference was unreasonable can be struck down.

*Section 17 Violations*

Section 17 provides in relevant part that "[every] common carrier by water in foreign commerce" and every "other person subject to this chapter" shall "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property." The FMC found that both PRPA and PRMSA had violated this section—PRMSA by its failure to grant other carriers secondary use privileges, and PRPA by its failure to require PRMSA to do so.

As a threshold matter, the majority holds PRMSA not subject to this section of the Act because it is neither a "common carrier by water in foreign commerce" nor an "other person subject to this chapter." Obviously the Puerto Rico-mainland trade is not "foreign commerce." The relevant portion of the definition of "other person" reads "any person, not included in the term 'common carrier by water', carrying on the business . . . furnishing . . . termi-

nal facilities in connection with a common carrier by water." Since the definition of "other person" thus seems to apply only to those not already included in the phrase "common carrier by water," the majority concludes that PRMSA, which is obviously a common carrier by water, cannot be an "other person" as well. But the statutory language can just as well be read to mean "any person, [even though] not included in the term 'common carrier by water' . . ." The majority goes on to argue that PRMSA has not in fact furnished terminal facilities; but, as I have pointed out above, PRMSA has held itself out as providing terminal facilities. Moreover, PRMSA's unreasonable refusal to allow other carriers access to its facilities should not be allowed to insulate it from the regulated status of a terminal operator, when the statute is intended to prevent such unreasonable use. It makes no sense to me to read the statute to allow jurisdiction to be avoided by the very acts which the statute interdicts if jurisdiction is present. I would, therefore, hold PRMSA subject to the strictures of section 17.

The majority concedes that PRPA is subject to section 17.

In overturning the FMC's determination that section 17's mandate of "just and reasonable" regulations was violated by PRPA's and PRMSA's actions in restricting access to Isla Grande berths, the majority substitutes its own judgment for that of the Commission. In essence, the majority considers PRPA's policy of fostering further development of Puerto Nuevo to be justification for locking carriers out of already developed facilities. But in holding that the FMC cannot find a section 17 violation based on another theory, the majority in effect rules that all a carrier or terminal operator need do to establish the justness and reasonableness of its practices is to offer a rationally related public policy goal. This is not the standard by which the Commission's application of section 17 should be judged.

In the Commission's own view, the essence of the situation was that Seatrain's relatively small needs for port facilities in

Puerto Rico would not justify the large investment Seatrain would have had to make to build a facility comparable to Isla Grande at Puerto Nuevo. Faced with PRPA's and PRMSA's refusal to allow secondary use, Seatrain might well leave the mainland-Puerto Rico trade entirely. Certainly the FMC was reasonable in concluding that such a result, with its consequent damage to competition, was less desirable than the speculative damage to the PRPA's plan for the more extensive development of port facilities. It was unlikely in any event that the actions by PRMSA and PRPA would result in investment by Seatrain at Puerto Nuevo, because such investment would not have made economic sense. But in any case, it is not for a reviewing court to say that either view of the likely economic consequences was a view that had to be adopted by the Commission. Since either interpretation would have been reasonable and is supported by substantial evidence, we are bound to respect the discretionary choice made by the Commission.

Although the majority does not reach the question, it seems appropriate to consider the relief ordered by the Commission. The majority appears to be troubled by the fact that the FMC fashioned relief suited to the facts in the case before it, rather than establishing a blanket rule requiring secondary use at all ports and for all carriers. By contrast, the Commission's restrained action appears appropriate to me. As indicated above, there are two conflicting policies and interests to be balanced—the port's interest in fostering investment, and the national interest in fostering competition and efficient use of resources through the avoidance of duplication of large capital installations. On the facts before it, taking into account this intervenor's level of berth usage, the Commission seems to me to have struck a balance well within the appropriate limits. Any provision for secondary use, whether allowed voluntarily or pursuant to an FMC order, could and would have included adequate provision for payments by the secondary user to the owner of the facilities, thus maintaining the investment incentive intact. The relief ordered by the

Commission in this case could have been based on any one of the violations of the 1916 Act found by the FMC in the two proceedings. By finding every one of them infirm, factually or legally, the majority not only mistakenly interprets the record and the statute, but hamstrings the FMC's efforts to secure efficient use of resources and sufficient competition in an industry that has suffered from inefficiency for too long.